# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN

| | | |
|---|---|---|
| State Farm Mutual Automobile Insurance Company, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. |
| Pointe Physical Therapy LLC, | ) | **PLAINTIFF DEMANDS** |
| New Era Physical Therapy, P.C., | ) | **TRIAL BY JURY** |
| New Era PT Services, Inc., | ) | |
| Ram Gunabalan, M.D., | ) | |
| Sherif El-Sayed, | ) | |
| Amale Bazzi a/k/a Amanda Bazzi, | ) | |
| Michigan Visiting Physicians, PC d/b/a Choice House Call, | ) ) | |
| Mundy Pain Clinic P.C., | ) | |
| Medical Evaluations P.C., | ) | |
| Martin Quiroga, D.O., | ) | |
| Andrew Ruden, M.D., | ) | |
| James Beale Jr., M.D., | ) | |
| Sean John Hoban, M.D., and | ) | |
| Bio-Magnetic Resonance, Inc., | ) | |
| | ) | |
| Defendants. | ) | |

## <u>COMPLAINT</u>

State Farm Mutual Automobile Insurance Company ("State Farm") for its

Complaint ("Complaint"), alleges as follows:

## I.    NATURE OF THE ACTION

1.    This action seeks to recover money fraudulently obtained by Defendants from State Farm through the submission of hundreds of bills and related documentation from:

(a)    physical and occupational therapy facilities Pointe Physical Therapy LLC ("Pointe"), New Era Physical Therapy, P.C ("New Era I") and New Era PT Services, Inc. ("New Era II") (collectively the "Treatment Facilities"), for treatment purportedly provided to individuals ("patients") who were involved in motor vehicle accidents and eligible for Personal Injury Protection benefits ("No-Fault Benefits") under State Farm insurance policies;

(b)    clinics Michigan Visiting Physicians, PC d/b/a Choice House Call ("Choice"), Mundy Pain Clinic P.C. ("Mundy"), and Medical Evaluations P.C. ("Medical Evaluations") (collectively the "Prescribing Clinics"), at which physicians purported to evaluate patients and provide prescriptions for the medically unnecessary physical and occupational therapy provided by the Treatment Facilities;

(c)    physicians Ram Gunabalan, M.D. ("Gunabalan"), Martin Quiroga, D.O. ("Quiroga"), Andrew Ruden, M.D. ("Ruden"), James Beale Jr., M.D. ("Beale"), and Sean John Hoban, M.D. ("Hoban") (collectively the "Prescribing Physicians"), who purported to evaluate patients and wrote prescriptions for the medically unnecessary therapy provided by the Treatment Facilities;

(d)    Gunabalan, Sherif El-Sayed ("El-Sayed"), and Amale Bazzi a/k/a Amanda Bazzi ("Bazzi") (collectively the "Management Group") who, at all times, secretly owned and/or controlled the Treatment Facilities and Prescribing Clinics, controlled the Prescribing Physicians, solicited and supplied patients to the Prescribing Clinics, Prescribing Physicians and Treatment Facilities, maintained referral relationships with patients' personal injury attorneys, directed patients' treatment, coordinated patients' transportation to and from

2

the Treatment Facilities and Prescribing Clinics, and stood to profit from all aspects of the scheme; and

(e)     a magnetic resonance imaging testing facility, Bio-Magnetic Resonance, Inc. ("Bio-Magnetic" or the "MRI Facility") that was owned and/or controlled by Gunabalan and to which patients of the Treatment Facilities were referred for unnecessary MRIs.

2.     Defendants' scheme is centered upon the Treatment Facilities, which were owned and/or controlled by the Management Group and were formed and used by the Management Group to submit bills and other documentation to State Farm for physical and occupational therapy purportedly provided to patients who had been involved in automobile accidents.  The Treatment Facilities' bills and supporting documentation submitted to State Farm were fraudulent because, as described more fully below, the services either were not performed or were performed pursuant to a fraudulent predetermined treatment protocol ("Predetermined Protocol"), rather than to address the unique needs of the individual patients, and in violation of Michigan's prohibition on physician self-referrals.

3.     Specifically, pursuant to the Predetermined Protocol, the Treatment Facilities purported to provide the same physical therapy modalities — typically hot and/or cold packs, electrical stimulation, ultrasound, therapeutic exercise and manual therapy or massage — to virtually every patient on almost every visit for as long as possible, regardless of their unique conditions, needs, and progress, or lack

3

thereof.  *See* Exs. 1 and 2.  In addition, in early 2010, an occupational therapist was hired to work at Pointe and in approximately October or November 2010, that same occupational therapist began working at New Era.  Once the occupational therapist was hired, the Treatment Facilities purported to incorporate occupational therapy into the Predetermined Protocol at the respective facilities.

4.      The occupational therapy modalities included modalities identical to the physical therapy modalities except that, while the occupational therapist purported to provide the modalities on the upper part of the body, the physical therapist purported to provide the same modalities on the lower part of the body. During the period when each Treatment Facility employed the occupational therapist, the incorporation of occupational therapy into the Predetermined Protocol resulted not only in the provision of medically unnecessary occupational therapy, but double billing because, for many patients, the Treatment Facilities billed two charges for the same modality – for example, one charge for hot packs applied by the occupational therapist to the patient's upper body, and a second charge for hot packs applied by the physical therapist to the patient's lower body. If the same hot packs had been applied to both the upper and lower body by either the physical therapist or occupational therapist, the Treatment Facilities would have been limited to one charge for all the hot packs.  Moreover, the addition of an occupational therapist resulted in the Treatment Facilities purporting to provide

and bill for yet another service, self-care training, which had never been provided or purportedly needed before the occupational therapist arrived and was never provided or apparently needed after she stopped working at the Treatment Facilities. *See* Exs. 1 and 2.

5.     Under Michigan law, physical therapy cannot be performed without a prescription from a physician.   Thus, the Management Group needed a ready supply of physicians willing to prescribe medically unnecessary therapy for the Treatment Facilities' patients.   The Management Group set up the Prescribing Clinics, hired physicians including the Prescribing Physicians to work for them, and directed the Prescribing Physicians and others working at the Prescribing Clinics to write prescriptions for medically unnecessary therapy that would be provided at the Treatment Facilities.   Moreover, although a prescription is not required to perform occupational therapy under Michigan law, after occupational therapy was incorporated into the Predetermined Protocol, physicians who worked at the Prescribing Clinics, including the Prescribing Physicians, began to prescribe medically unnecessary occupational therapy as well.   The occupational therapy prescriptions purportedly were issued to treat primarily cervical, or upper body, sprains and strains, and head trauma, headaches and closed head injuries. Remarkably, the number of patients diagnosed with headaches and closed head injuries significantly increased about the time Pointe hired an occupational

therapist in early 2010, and many of these patients were then prescribed occupational therapy. *See* Ex. 3, listing who were diagnosed with head injuries and received and/or were prescribed occupational therapy. Despite the fact that head injuries caused by an automobile accident often appear at or about the time of the accident, some patients were not diagnosed with headaches or closed head injuries until well after their accidents or after another examination in which there had been no indication of such an injury. *Id*.

6.      Two of the Prescribing Clinics, Choice and Mundy, were owned on paper by Gunabalan, and the third, Medical Evaluations, was owned on paper by Beale. In fact, however, all three Prescribing Clinics were owned and/or controlled by all three members of the Management Group.

7.      In addition, the Management Group directed the Prescribing Clinics and Prescribing Physicians to steer patients for medically unnecessary MRIs at the MRI Facility owned and/or controlled by Gunabalan which were then billed to and paid for by State Farm.

8.      The Management Group also directed the Prescribing Clinics and Prescribing Physicians to issue disability certificates which, among other things, enabled patients to receive transportation to and from the Treatment Facilities and Prescribing Clinics – primarily from two companies, Get Well Medical Transport Co. ("Get Well Transport") and Transport Us, LLC ("Transport Us"), which were

owned by relatives of the Management Group – at no cost to the patients, but at a significant cost to State Farm. *See* Exs. 1 and 2.

9. Pursuant to the Predetermined Protocol, the Prescribing Physicians continue to examine and prescribe physical and/or occupational therapy, and the Treatment Facilities continue to provide the same modalities on almost every visit for as long as possible to maximize: (a) the amounts that can be billed to State Farm; and (b) the value of the patients' personal injury claims in order to curry favor with a small group of personal injury attorneys ("PI Attorneys") with whom Defendants appear to have substantial *quid pro quo* cross-referral relationships.

10. The Management Group also solicited and/or supplied patients to be: (a) evaluated and prescribed therapy by the Prescribing Physicians and at the Prescribing Clinics, and (b) ultimately treated at the Treatment Facilities. In particular, many patients were referred to the Treatment Facilities, Prescribing Clinics and/or Prescribing Physicians by attorneys, investigators and solicitation services. The Management Group had *quid pro quo* cross-referral relationships with PI Attorneys in which, among other things, PI Attorneys were motivated to send patients to facilities controlled by the Management Group because Defendants referred patients to them, and their facilities could be counted on to treat patients in a way that inflated the value of potential tort claims. The Management Group acted as a liaison with PI Attorneys, brought patients to their

clinics, exercised control and influence over those clinics, and then used that influence to ensure that patients were prescribed physical therapy and sent for that therapy to the Treatment Facilities.

11.     Defendants' scheme began at least as early as December 2007, and has continued uninterrupted since that time.  As a direct and proximate result of the scheme, State Farm has incurred actual damages of at least $775,000 in No-Fault Benefits paid to Defendants.

12.     This action seeks a declaratory judgment that State Farm is not liable for any pending bills or bills submitted during the pendency of this action by Defendants based upon the above-described conduct.  This action also asserts common law claims for fraud and unjust enrichment, as well as statutory claims under 18 U.S.C. §§ 1962(c) and (d) ("RICO"), to recover actual damages of at least $775,000 in No-Fault Benefits paid to Defendants, plus treble damages and costs, including reasonable attorneys' fees.  State Farm has not been reimbursed by the Michigan Assigned Claims Facility, the Michigan Catastrophic Claims Association or any other source for any of the claims at issue in this case.

## II.     ALLEGATIONS COMMON TO ALL COUNTS

### A.     The Management Group Owned And/Or Controlled The Treatment Facilities And The Prescribing Clinics

#### 1.     Treatment Facility Defendants

13.   The Treatment Facilities – Pointe, New Era I and New Era II – purport to provide physical therapy and occupational therapy to patients and were secretly owned and/or controlled by the Management Group – Gunabalan, El-Sayed and Bazzi.   The Treatment Facilities consistently followed the Predetermined Protocol, employed the same individuals, and generated the same documentation to support their fraudulent claims.   Patients were steered to the Treatment Facilities based on prescriptions from the Prescribing Physicians, Prescribing Clinics and other physicians, at the direction and orchestration of the Management Group.

14.   As set forth below, the Management Group owned and/or controlled the Treatment Facilities and knowingly coordinated and controlled this aspect of the scheme.

### a.   Pointe Physical Therapy

15.   Gunabalan is identified as the organizer of Pointe on documents filed with the State of Michigan and has testified that he owns Pointe.

16.   Gunabalan is the registered agent of Eastpointe Associates LLC which owns 17200 East Ten Mile Road, Eastpointe, Michigan, the building in which both Pointe and Choice are located.

17.    Dr. Joel Milliner – who worked for both Choice and Medical Evaluations – testified that he understood Pointe was owned by El-Sayed and a female partner who was "probably" named "Amanda."

18.    El-Sayed's role with respect to Pointe is reflected in his significant participation in directing patients to treatment at Pointe.  Indeed, Milliner testified that El-Sayed owned and controlled Medical Evaluations to steer patients into receiving therapy at Pointe.  Specifically, Milliner stated that El-Sayed owned Medical Evaluations and hired Milliner as an independent contractor to evaluate automobile accident patients.  Milliner was not paid by Medical Evaluations and did not pay rent or any other amounts to Medical Evaluations, but used its facility, equipment and staff.  In exchange, Milliner testified, "if they had a patient in an auto accident, they could refer for physical therapy."  According to Milliner, El-Sayed told Milliner that if he referred patients for physical therapy, El-Sayed had a facility to use, and while Milliner did not testify to the name of the facility, patients were referred to the physical therapy facility in the same building as Choice, namely Pointe.  Milliner further testified that patients would arrive at Medical Evaluations by the van-load, and he did not know where they came from.  Milliner worked at Medical Evaluations for approximately one month, at which point "it stopped feeling right" because patients were brought to him and he did not know

where they came from, and some patients appeared to have been in minor accidents, such that he did not understand the need for continued therapy.

19.     Similarly, Syed Raoof, a doctor who examined and prescribed therapy for several patients who were treated at Pointe, described the roles of Bazzi and El-Sayed in generating patients and prescriptions.    Raoof, who billed for these examinations through Pinnacle Medical Services, P.C. ("Pinnacle"), testified that at Pinnacle: (a) all of his patients were auto accident patients, (b) patients were brought to him by Bazzi, who acted as a liaison between the attorneys and him, (c) all of his "patients [were] referred to physical therapy clinics that are owned by Amanda," (d) attorneys "would give patients to Amanda and Amanda would distribute all the patients to her various, a dozen or more clinics," (e) Amanda trained Raoof's staff on how to refer patients for physical therapy, (f) Amanda provided Raoof with an office manager – El-Sayed – who paid all of Raoof's medical assistants, as well as Pinnacle's utilities and rent, and Raoof did not have to pay for anything, (g) Raoof contracted his billing to a company owned by Amanda, Quick Health Care Billing, Inc., and did not set his own prices, (h) Raoof only kept 40-45% of the collections, and (i) Raoof was pressured by Amanda and El-Sayed to continue prescribing physical therapy to "build the case up," but was "uncomfortable" and thought the arrangement "morally [did not] sound right," and thus, ultimately terminated his relationship with Amanda and closed Pinnacle.

**b.      New Era I And New Era II**

20.     On paper, New Era I and New Era II appear to be distinct entities, with the former owned on paper by Vinod Joshi, a physical therapist, and the latter owned on paper by Gigi John, also a physical therapist.  In fact, New Era I and New Era II are one and the same and both were at all times owned and/or controlled by the Management Group.

21.     New Era I and New Era II operated out of the same location in Flint, Michigan.

22.     New Era II purported to acquire and assume the operations of New Era I, but the transaction was nothing more than a sham.  Joshi is identified as the incorporator, resident agent, president and vice president of New Era I in public filings with Michigan Department of Energy, Labor and Economic Growth ("DELEG").  On October 19, 2009, New Era I submitted its last bill to State Farm, and Joshi has testified that it stopped operating on November 2, 2009.  Four days later, on November 6, 2009, New Era II was formed with Gigi John as the incorporator and resident agent.  However, Joshi admitted that he did not sell his business or any of its assets, he did not get paid for any of the assets, he did not remove any equipment from the facility after the sale, and there were no transactions between him and the person who took over.  Rather, El-Sayed – who Joshi claims was only the "office manager" of New Era I – facilitated the

transaction by "hir[ing] somebody named Gigi." Notably, a motive for the "transfer" from New Era I to New Era II might be that only one month after the purported transaction, Allstate filed suit against Joshi, Bazzi, Beale, Medical Evaluations, and others, including Salma Sheikh and Global Medical Billing (both of whom provided billing services to New Era) in an action alleging fraud and conspiracy. The attorney who represented these individuals and entities in that lawsuit, Michael S. Cafferty, was the same attorney who submitted New Era II's Articles of Incorporation. *See* Ex. 4. Even after the purported transaction, Joshi continued to file annual updates for New Era I with the DELEG, submitting the 2010 and 2011 updates on February 22, 2011, and the 2012 update on February 14, 2012, each time using the common address for New Era I and New Era II. Indeed, one employee of New Era I has testified that he and another employee continued working at New Era II, even though "somebody else bought the company."

23. Extensive evidence establishes ownership and/or control of New Era I and New Era II by the Management Group. First, both Pointe – which Gunabalan admitted to owning and Bazzi and El-Sayed also owned and/or controlled as discussed above – and New Era simultaneously employed the same occupational therapist, Megan Rutledge. Rutledge has testified that she worked at both facilities, alternated the days she worked between them, and received a single paycheck from Pointe for her work at both facilities. Moreover, Gigi John, the

paper owner of New Era II, is identified as the President of Pointe in the National Provider Identifier registry. *See* Ex. 5. Gunabalan testified that Gigi John worked for Pointe identifying and hiring physical therapists to work at Pointe. Additionally, as discussed more fully below, documentation from Pointe, New Era I and New Era II follows an almost identical pattern.

24.    At least two employees of New Era, Michelle Klaty and Tiffany Lyles, have testified that Bazzi appeared to be related to El-Sayed and to co-own New Era with El-Sayed. Klaty also testified that Bazzi would come into New Era to call patients who were not showing up for their appointments and would yell at them.

25.    The 2010 annual update for New Era II filed with the DELEG identifies Hala Moussa f/k/a Hala Makki ("Makki") as the president, secretary, treasurer, and director of New Era II. Makki was formerly married to Bazzi's first cousin.

26.    Klaty, Lyles and Joshi have also testified that El-Sayed managed, operated and directed the activities of New Era. In particular, although he was not a physical therapist or a doctor, El-Sayed: (a) routinely directed the treatment of patients, on occasion bringing patients back to New Era after New Era employees had attempted to discharge them because they had reached their maximum medical improvement; (b) directed the preparation of progress notes, and instructed

therapists to make changes on a weekly basis designed to reflect gradual patient improvement, regardless of the patient's actual condition; (c) was involved in coordinating patients' transportation to and from New Era through transportation companies that appeared to employees to be affiliated with New Era and/or El-Sayed; (d) dealt with the patients' attorneys; (e) managed efforts to hide the relationship with attorneys by instructing New Era employees to shred scheduling documents reflecting patients' appointments with attorneys at the offices of New Era; (f) signed the lease for New Era; and (g) facilitated New Era's transfer of paper ownership in November 2009 from Joshi to John without any involvement from Joshi.  Klaty testified that El-Sayed had "so much control," and was "the final word in a lot of things."

27.     Moreover, El-Sayed was responsible for steering patients to New Era. Byron Schoolfield, M.D. ("Schoolfield"), who employed defendant Hoban at Internal Medicine Associates of Flint, P.C. ("IMA"),  testified that:  (a) "Dr. Hoban wasn't as busy when he was first starting" at IMA, and so El-Sayed sent patients to IMA and "just asked Hoban if he would see [the] patients"; (b) "Sherif would refer [auto accident] patients to Internal Medicine Associates"; (c) with "just regular patients" who might need physical therapy it was Schoolfield's practice to "be sending them . . . [to] different places"; (d) but with patients referred by El-Sayed the doctors would prescribe physical therapy and then "just . . . funnel them to

New Era"; (e) some files even had notations on them "MVA Sherif.  MVA Sherif PT" and "MVA New Era. Go over report.  MVA Sherif PT";  (f) patients were sent to New Era despite the fact that it was not providing records back to IMA regarding the physical therapy; (g) El-Sayed told Schoolfield the patients he brought in had to receive therapy from New Era because of an insurance company rule which would result in non-payment if they were sent anywhere else; and (h) Schoolfield thought New Era might belong to El-Sayed.  In fact, Dr. Hoban treated 57 of the New Era patients identified on Exhibit 2.  *See* Ex. 2.

### 2.    The Prescribing Clinics

28.    The Prescribing Clinics are medical facilities at which physicians: (a) evaluated patients and wrote prescriptions for physical therapy and occupational therapy that would be provided by the Treatment Facilities; (b) signed disability certificates that could be used to increase the value of personal injury claims to further Defendants' *quid pro quo* cross-referral relationships with attorneys and support charges for transportation; and (c) ordered unnecessary MRIs, many of which are performed at the MRI Facility owned by Gunabalan when patients fail to fully recover from the medically unnecessary physical therapy and occupational therapy.   Despite representations to the contrary in public filings, all three Prescribing Clinics – Choice, Mundy and Medical Evaluations – were owned

and/or controlled by Gunabalan, El-Sayed and/or Bazzi, and were formed and used to steer patients to the Treatment Facilities.

29.     The connection between Choice, Mundy and Medical Evaluations, their role in the scheme, and the involvement of Gunabalan, El-Sayed and Bazzi in each Prescribing Clinic, manifest themselves in: (a) common Predetermined Protocols and documentation employed by each; (b) overlap of physicians employed by and associated with each (*e.g.*, several physicians – including Ruden, Joel Milliner, Nazih Iskander, Jack Belen and Mark Brennan – have worked for Choice, Mundy and Medical Evaluations); and (c) testimony reflecting the connections and the active involvement and participation of Gunabalan, El-Sayed and Bazzi in each of the Prescribing Clinics.

30.     Similarly, Mundy and Medical Evaluations used the same billing company as New Era I, namely Global Medical Billing, Inc.  Choice used the same billing company as Pointe and New Era II, namely Quick Healthcare Billing, Inc.  Global Medical was incorporated and purportedly operated by Salma Sheikh a/k/a Salma Ali.  Quick Healthcare Billing was incorporated by Muhammad Raza, but Dr. Raoof has testified that it was owned by Bazzi.

31.     Moreover, with respect to each particular Prescribing Clinic there is the following additional evidence reflecting the Management Group's ownership and/or control:

### a.    Choice

32.    Gunabalan was the sole shareholder of Choice.

33.    Dr. Mark Brennan, who worked at Choice, has testified that El-Sayed brought patients to Choice to be evaluated.

34.    Choice and Medical Evaluations were the Prescribing Clinics responsible for prescribing much of the medically unnecessary physical therapy and occupational therapy purportedly performed on the patients at Pointe.  *See* Ex. 1.

### b.    Mundy

35.    Gunabalan was the sole shareholder of Mundy.

36.    One therapist who worked at New Era I testified that El-Sayed told her that he had opened Mundy, and El-Sayed himself has admitted that he "marketed" New Era's services to Mundy.

37.    Ruden, who worked at both Mundy and Medical Evaluations, testified to seeing El-Sayed at both locations.

38.    Mundy was the Prescribing Clinic responsible for prescribing a great deal of the medically unnecessary physical therapy and occupational therapy purportedly performed on the patients at New Era I and II.  *See* Ex. 2.

### c.    Medical Evaluations

39.    While Beale has testified that he owns Medical Evaluations, and

Beale's name appears on corporate filings with the DELEG, Beale is nothing more than a paper owner whose name was used to conceal Medical Evaluations' true owners.

40.     Specifically, on February 28, 2008, Medical Evaluations & Testing, P.C. ("Medical Evaluations I") was formed, purportedly by Terry Reznick, D.O. ("Reznick"), with an address of 20411 Twelve Mile Road, Southfield, Michigan. El-Sayed worked at Medical Evaluations I, purportedly as a manager.   Beale testified that in approximately February 2009, he purchased Medical Evaluations I from Reznick, and on February 11, 2009, a new entity, Medical Evaluations, was formed, purportedly by Beale, using the same address as Medical Evaluations I. However, Reznick has testified that while he worked at Medical Evaluations I, he did not own it, was an employee, does not know Beale, and did not sell Medical Evaluations I to Beale.  Reznick has stated that: (a) he did not fully understand or know who owned Medical Evaluations I when he was employed there; (b) he signed his employment contract with a woman named "Fay"; (c) Hala Makki managed Medical Evaluations I and had an office there; and (d) Amanda Bazzi was somehow involved and may have been a partner.  Fatmeh Chebab who goes by "Faye" is Amanda Bazzi's sister.  As stated above, Makki was formerly married to Bazzi's first cousin.

41.     Dr. Milliner and Ruden, both of whom worked at Medical Evaluations, testified that they never met Beale.  Milliner testified that El-Sayed owns Medical Evaluations.  Ruden stated that he never saw Beale, the paper owner, but rather "it was mainly Sherif" El-Sayed who was running Medical Evaluations, who hired Ruden, and to whom Ruden reported, and that El-Sayed worked for Bazzi.

42.     Ruden further testified that it was Gunabalan who introduced him to Medical Evaluations and Gunabalan who actually paid him for his work at Medical Evaluations.  Specifically, Ruden testified that he started working at Medical Evaluations because while he was working at Choice, Gunabalan "was looking for [Ruden] to have an extra day of work," and Gunabalan "knew somebody [at Medical Evaluations]," namely El-Sayed, who hired him.  Moreover, Ruden testified that when he worked at Medical Evaluations, he "was getting paid through one of Dr. Gunabalan's umbrella companies," Michigan Visiting Physicians, P.C. ("Michigan Visiting Physicians").  Gunabalan is, in fact, the incorporator, resident agent, and sole officer of Michigan Visiting Physicians, which, coincidentally, has an assumed name of Choice House Call.  *See* Exs. 6 and 7.

43.     Dr. Irwin Lutwin, who worked at Medical Evaluations for ten years, testified that he does not know who owns it and that nobody "hired" him.

**B.     First-Party Claims For PIP Benefits**

44.     Under the Michigan No-Fault Act, insurers are required to pay personal injury protection ("PIP") benefits, including "allowable expenses consisting of all reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery or rehabilitation," when those expenses are causally connected to an "accidental bodily injury arising out of the ownership, operation, maintenance or use of a motor vehicle."  MCL §§ 500.3105, 3107(1)(a).

## C.     Tort Claims For Non-Economic Loss

45.     Individuals who are not substantially at fault for the accidents underlying their claims may also potentially recover: (a) non-economic losses, such as for pain and suffering, from the drivers who were at fault for the accidents ("At-Fault Drivers") through a bodily injury claim ("BI Claim"), only in limited situations, including if the individual has suffered serious impairment of body function, *see* MCL § 500.3135; and (b) if recovery under the BI Claim is insufficient, from the patients' own insurance companies through an underinsured or uninsured motorist claim ("UM Claim").

46.     An individual has suffered serious impairment of body function when his general ability to conduct the course of his normal life has been affected as a result of his injury.  A determination of serious impairment requires an analysis of several factors, including: (a) the nature and extent of the impairment; (b) the type

and length of treatment required; (c) the duration of the impairment; (d) the extent of any residual impairment; (e) the prognosis for eventual recovery; and (f) whether there is "objective manifestation" of the injury.

### D.   *Quid Pro Quo* Relationships Between Defendants And PI Attorneys

47.    The success of Defendants' scheme depends heavily upon *quid pro quo* cross-referral relationships with PI Attorneys who represent patients in connection with BI Claims and UM Claims.  Specifically, the PI Attorneys are motivated to refer patients to Defendants because the PI Attorneys can rely upon Defendants' Predetermined Protocol to: (a) establish an "objective manifestation" of serious impairment of body function, which is required to satisfy the threshold for bringing tort liability claims for non-economic loss on behalf of the patients and their other clients; and (b) inflate the value of the BI Claims and UM Claims. This, in turn, increases the contingency fees available to the PI Attorneys through the BI Claims and UM Claims.  At the same time, Defendants are motivated to refer patients to the PI Attorneys and provide them with bills and reports to curry favor with and induce more patient referrals from the PI Attorneys.

48.    Indeed, many of the patients for whom the Treatment Facilities submitted bills to State Farm were represented by a handful of PI Attorneys and law firms.  *See* Exs. 1 and 2.  Specifically, many of the patients for whom the Treatment Facilities submitted bills were represented by Weiner & Associates,

Wigod Falzon, or Ravid & Associates. *See* Exs. 1 and 2. Moreover, each of these firms represented patients who treated not just at Pointe but also New Era, even though New Era was located in Flint, Michigan, and none of these firms or PI Attorneys are located in the greater Flint area.

### E. Disability Certificates

49. Another component of Defendants' scheme involves the issuance of disability certificates through which the Prescribing Physicians and the Prescribing Clinics fraudulently certify that many patients are unable to work, drive, and/or perform household tasks. These certificates are issued for almost all of the patients of the Treatment Facilities, and are used to support claims for wage loss benefits, transportation, attendant care, and replacement services. *See* Exs. 1 and 2.

50. Disability certificates are often provided to the Prescribing Physicians by the Management Group. In many instances, there is no discussion in the patient's initial examination reports, progress notes or other medical charts about the patient's specific home activities, driving abilities, work activities, or any other information that would allow a doctor to make a real assessment of the disabilities of the patient and the accommodations that may be medically necessary. Representative examples of the Prescribing Physicians' disability certificates are attached hereto as Ex. 8.

51.     Among other things, these certifications enable patients to receive transportation to and from the Treatment Facilities, the Prescribing Clinics and the MRI Facility, at no cost to the patients, but at a significant cost to State Farm.   By providing transportation at no cost to the patients, Defendants are able to maximize the likelihood that patients will attend their scheduled visits and continue treatment.

52.     Two transportation companies, Get Well Transport and Transport Us, provided transportation for many of the patients.  *See* Exs. 1 and 2.  Get Well Transport is owned by Hala Makki, who, as set forth above, is purportedly the sole officer and director of New Era II, and was formerly married to Bazzi's cousin.  At least one van that is used by Transport Us is registered to Tanya Bazzi, who shares an address with Amanda Bazzi at 5775 Golfview Drive, Dearborn Heights, Michigan.  Otha Hodge, a driver for Get Well, testified that when he transported patients, he used Transport Us log sheets even though he was driving for Get Well. Get Well and Transport Us both used Global Billing for their billing, the company that provided billing services to Mundy, Medical Evaluations and New Era I.  Dr. Schoolfield testified to his belief that El-Sayed was connected to transportation provided to patients of IMA.   In fact, of the 30 Hoban patients at IMA identified on Exhibit 2, 19 received transportation services from Transport Us.  *See* Ex. 2.

53.     The fees charged by Get Well and Transport Us produced significant profits.  Get Well charged between $85 to $100 to transport patients to and from the Prescribing Clinics and the Treatment Facilities, and as much as $250 to take them to and from the MRI Facility.  Transport Us charged between $75 to $90 to transport patients to and from the Prescribing Clinics and the Treatment Facilities, and as much as $265 to take them to and from the MRI Facility.  In contrast, a patient taking a taxi in the Detroit area would pay $2.50 for the trip plus $1.60 per mile.  Get Well and Transport Us, however, take advantage of Michigan's No-Fault laws and, knowing they are only submitting their bills to insurance companies like State Farm, charge significantly more.  A comparison of their rates for a sample of patients in Exs. 1 and 2 can be seen below:

| Patient Claim No. | Company | Destination | Miles | Roundtrip Price Taxi | Roundtrip Price Transportation Company |
|---|---|---|---|---|---|
| 22K360674 | Get Well | Pointe PT | 9 | $33.80 | $85.00 |
| 22C450882 | Get Well | Bio-Magnetic | 14.6 | $51.72 | $250.00 |
| 22124V176 | Get Well | Pointe PT | 10.6 | $38.92 | $85.00 |
| 22169P175 | Get Well | Pointe | 12.4 | $44.68 | $100.00 |
| 22A759905 | Transport Us | New Era | 2.3 | $12.36 | $75.00 |
| 22A914767 | Transport Us | New Era | 11 | $40.20 | $80.00 |
| 22K360769 | Transport Us | New Era | 3.3 | $15.56 | $90.00 |

These charges are even more excessive when it is considered that, at times, Get Well and Transport Us transport multiple passengers in their vehicles at one time, allowing them to multiply their charges by the number of passengers.

54.     Based on the disability certificates and referrals, Get Well and Transport Us are able to obtain and profit from patients' No-Fault Benefits.  In turn, the "complimentary" transportation serves as an inducement to the patients to treat at the Prescribing Clinics, the Treatment Facilities and the MRI Facility and helps ensure that they will continue treatment as long as possible with maximum profit for all Defendants.  By repeatedly and falsely certifying that the patients are disabled, the Prescribing Physicians and other physicians at the Prescribing Clinics ensure that their fraudulent scheme can continue by:  (a) incentivizing patients to continue to treat at the Prescribing Clinics where they will receive disability certificates that can reimburse them for replacement services, attendant care, and wages; (b) providing them "free" transportation; and (c) benefiting the PI Attorneys by bolstering their clients' BI and UM damages claims.

55.     Additionally, the disability findings:  (a) support patients' claims for replacement services (maximum of $20 per day for three years); (b) support patients' claims for lost wages; (c) support patients' claims for attendant care; (d) enable some patients to collect disability benefits; and (e) support the patients' "objective manifestation" of injury to satisfy the threshold for BI or UM Claims.

Indeed, for the patients whom the Prescribing Physicians and Prescribing Clinics purportedly treated,  State Farm paid more than $200,000 in replacement services, lost wages, transportation and attendant care.

**F.    The Legitimate Treatment Of Injuries Arising Out Of Auto Accidents**

**1.    Patients With Strains And Sprains**

56.    When an individual has been in a motor vehicle accident and complains of neck or back pain, a licensed professional must obtain a history and perform a legitimate examination to arrive at a legitimate diagnosis.  Based upon a legitimate diagnosis, a licensed professional must engage in medical decision-making to design a legitimate treatment plan that is tailored to the unique circumstances of each patient.  During the course of treatment, plans should be modified based upon the unique circumstances of each patient.  As set forth herein, these basic principles were not followed by Defendants.

57.    Sprains and strains involve injuries to ligaments, muscles, and/or tendons.  With a sprain, an individual's ligaments, the connective tissues that join the bones together, are overstretched or torn.  A strain occurs when a muscle and/or tendon is overstretched or torn.  Treatment plans for individuals with strains and sprains may involve no treatment and/or medicines at all because many of these kinds of injuries may heal within weeks without any intervention, or may include a combination of medicines and passive and active modalities.

58.     Passive modalities do not require any affirmative effort or movement by patients.  There are many kinds of passive modalities including hot and cold packs, ultrasound, diathermy, traction, manual therapy, massage, and traction. Active modalities require patients to affirmatively participate in their treatment, and include many different kinds of stretching and strengthening exercises.

59.     Passive modalities are performed to reduce pain and to facilitate active modalities, which are performed to promote the healing of strains and sprains.  In legitimate treatment plans, it is important to use passive modalities to the extent necessary to reduce pain and to facilitate active modalities, and to introduce active modalities as soon as practicable to promote healing of strains and sprains.

60.     The decision of which, if any, types of modalities are appropriate for each patient, as well as the level, frequency, and duration of the various modalities, should be individualized depending on the patient's unique circumstances and response to treatment.  Conversely, information obtained during an individualized history and physical examination can identify certain treatment that should not be undertaken as it would be detrimental to particular patients or mandate referral to particular specialists.

61.     Treatment plans, once implemented, should be periodically reassessed and modified based upon updated histories, re-examination findings, reported pain

levels, and return to functionality, all using well-documented decision-making processes.

62.  If patients are disabled due to their injury, a licensed professional must make an individualized evaluation of the patient's diagnosed disabilities, expected length of treatment, and what specific accommodations are necessary in light of the patient's work status, medical history, and daily activities.

63.  Patients should be discharged from treatment when they have reached maximum medical improvement, and/or when treatment results in no significant clinical improvement, such that no further treatment is likely to benefit the patient.

64.  The above-described process of history, examination, diagnostic studies, diagnosis, and treatment must be documented for the benefit of: (a) the licensed professionals involved in the patient's care; (b) other licensed professionals who may treat the patient contemporaneously or subsequently; (c) the patients themselves whose care and condition necessarily depends on the documentation of this information; and (d) payors such as State Farm who must pay for reasonable and necessary treatment.

### 2.  Patients With Closed Head Injuries

65.  While closed head injuries, head trauma, concussions and headaches can result from an automobile accident, when they do occur, symptoms typically appear at the time of the accident or immediately thereafter.  Such symptoms often

include loss of consciousness, nausea, vomiting, confusion, disorientation, distracted attention, sensory deficits, numbness, tingling, lack of coordination, olfactory deficits, ringing in the ears (tinnitus), motor deficits, altered speech, weakness in muscles, spasticity, vision issues or visual impairments, problems with spatial perception, problems with depth perception, and dizziness. Patients suffering such conditions are often treated in an emergency room at the time of an accident where medical professionals are alert to signs and symptoms of closed head injury and head trauma and record such symptoms if they exist.

### 3. Treatment Was Designed To Benefit Defendants, Not Patients

66. As described next, Defendants' patients were not legitimately examined, diagnosed, or treated for their unique conditions. Instead, they were subjected to a Predetermined Protocol in which the Prescribing Physicians and others employed by or associated with the Prescribing Clinics examine the patients to support predetermined prescriptions for physical therapy and occupational therapy, and the Treatment Facilities purport to provide virtually the same treatment to almost every patient on almost every visit for as long as possible, regardless of their unique conditions, needs, and progress, or lack thereof. Furthermore, the documentation of the examinations, diagnoses, and treatment submitted by the Prescribing Physicians, the Prescribing Clinics and the Treatment Facilities is fraudulent because the pervasive patterns in the documentation are not

credible, and the documentation reflects services that either were not performed or were not medically necessary because they were performed pursuant to the Predetermined Protocol that was designed to enrich Defendants, and not patients, by maximizing their collection of the patients' No-Fault Benefits.

### G.    Defendants' Scheme And The Fraudulent Predetermined Protocol

#### 1.    Patients And Solicitation

67.    As an initial matter, according to police reports, most of the Treatment Facilities' patients reported either no injuries or minor injuries at the time of the accident.  Moreover, more than half of the Treatment Facilities' patients whose treatment was billed to State Farm did not receive emergency room treatment at the time of the accident.

68.    To procure patients for their scheme, Defendants employ and use runners, cappers, and steerers with the intent to obtain patients and to fraudulently obtain their No-Fault benefits from State Farm, in violation of MCL § 500.4503(h) and (i).  This is an important aspect of the scheme because patients are the lifeblood of the scheme both for Defendants and for the PI Attorneys with whom Defendants have cross-referral relationships.

69.    Many patients were referred to the Treatment Facilities, Prescribing Clinics, and/or Prescribing Physicians by attorneys, investigators or solicitation services ("Solicitors").  Indeed, at least 20 individuals who treated at New Era and

14 individuals who treated at Pointe have stated that they were solicited by solicitors, including LegalGenius, PLLC ("LegalGenius"), who encouraged them to obtain medical care at the Treatment Facilities.

70.     Although LegalGenius holds itself out as the law firm of Michigan attorney Matthew Schwartz ("Schwartz") based in Southfield, Michigan, it actually provides solicitation services for other attorneys.  Specifically, several patients have testified that they were solicited by LegalGenius, yet none of them were represented by Schwartz or LegalGenius.  For example:

- Patient CS was contacted by an individual who claimed to work for LegalGenius.  Through LegalGenius, CS retained an attorney who directed CS to Dr. Quiroga.  CS then was directed to Pointe for physical therapy.

- Patient, BM, was contacted by phone by an individual named Alex Jacobson ("Jacobson") who worked for LegalGenius and testified that Jacobson said "everybody wants some money" and was "talking about suing somebody and . . . about going here and going there.  And like I told my [insurance] agent, I'm not trying to sue nobody, I just want to make sure I'm well, that's the bottom line."  Jacobson sent BM to Dr. Quiroga and then met with her at Dr. Quiroga's office.

- Patient BH testified that when she went to see Dr. Petre, someone from his office called "Alex" for her and Alex told her by phone that they could get her $20,000 if she would just fill out the forms and see the doctor.  BH testified that after she talked to Jacobson she:

  > started thinking . . . I don't really want to do this, but they kept on saying, "Just fill out the papers, just fill out the papers."  And I'm thinking to myself I don't really want to do this, I don't even want to be involved in this, but I sat there, filled out the papers.

- Patient KF was directed to Pointe by a solicitor who claimed to work for Injury Help Line.  The solicitor directed patient KF to Dr. Rajendra Bothra

for evaluation where an attorney attempted to meet with KF at the doctor's office.

- Patient CH was directed by an investigator who works for a law firm to Dr. Quiroga, who then directed patient CH to Pointe for physical therapy.

71.   New Era employee Michelle Klaty testified that Kevin Geer was among the attorneys who saw patients in the offices of New Era I, where he would spend the entire day in a space provided for him.  Tiffany Lyles testified that New Era set up its break room so that lawyers could meet clients and that patients of New Era I met with Geer and Ron Puzio in that room.  Lyles described how patients informed her that they had been contacted in the first instance by lawyers. Both Geer and Puzio ultimately represented a number of New Era I patients.  *See* Ex. 2.

### 2.   The Management Group Steered Patients Into Treatment Through The Prescribing Clinics, The Prescribing Physicians And Other Doctors

72.   The Management Group's primary goal is to steer patients to the Treatment Facilities so they can profit from the Treatment Facilities' submission of bills to insurers, like State Farm.  To achieve this goal, the Management Group brings or refers patients to the Prescribing Clinics, Prescribing Physicians and other physicians with the understanding that the patients will be prescribed physical and/or occupational therapy, regardless of whether the patients actually need therapy, so that the Management Group can then steer the patients to the

Treatment Facilities.  Further, the Management Group brings or refers patients to the Prescribing Physicians and Prescribing Clinics with the understanding that they will: (a) issue disability certificates to enable the patients to receive additional benefits, such as transportation to take them to and from their doctors and therapy appointments; and (b) prescribe MRIs, regardless of whether the patients actually need them, so that the Management Group can steer the patients to the MRI Facility owned by Gunabalan.  It is critical to the success of the scheme that the Management Group can: (a) provide a ready stream of patients; and (b) control the physicians and thereby influence them into prescribing treatment at the Treatment Facilities.

73.    Indeed, several physicians have testified that the Management Group supplied their patients.  For example, Dr. Raoof, who examined and prescribed therapy for several of the Pointe patients at issue, explained that Bazzi acted as a liaison with attorneys, attorneys would send their clients to Bazzi, and Bazzi would distribute them to "a dozen or more clinics."  Similarly, Dr. Milliner described patients arriving by the vanload at Medical Evaluations, which he said was owned by El-Sayed.  Dr. Schoolfield explained how El-Sayed brought patients to IMA, while Brennan testified that El-Sayed brought patients to Choice.

74.    After the patients were brought to the Prescribing Clinics and Prescribing Physicians, it was understood by the physicians that they would

prescribe therapy, whether the patients needed it or not, and that the therapy would be provided at the Treatment Facilities.   Dr. Milliner explained that under his arrangement with Medical Evaluations he "believe[d] that what they got out of it was that if they had a patient in an auto accident, they could refer for physical therapy," and El-Sayed had a facility where the patients should go, namely Pointe. Dr. Schoolfield testified that: (a) patients brought to IMA by El-Sayed would be prescribed physical therapy, usually by Dr. Hoban; (b) patients were then sent to New Era by El-Sayed; (c) to signify and keep track of patients who were referred by the Management Group, files even had notations on them stating "MVA Sherif. MVA Sherif PT" and "MVA New Era. Go over report.  MVA Sherif PT"; and (d) El-Sayed told Dr. Schoolfield that an insurance company rule required patients be sent for therapy to New Era.  In fact, 57 of the 111 New Era patients identified on Exhibit 2 were treated by Dr. Hoban at IMA and Mundy.  *See* Ex. 2.

75.    The Management Group uses its control and influence over the Prescribing Physicians to ensure that patients are prescribed therapy and sent to the Treatment Facilities.   As Dr. Raoof explained, his practice at Pinnacle Medical Services was essentially controlled by the Management Group.   "Amanda" installed El-Sayed as an office manager, El-Sayed paid all of Dr. Raoof's medical assistants, utilities and rent, and Dr. Raoof did not have to pay any expenses. "Amanda's" billing company handled Dr. Raoof's billing and set his prices, and

Dr. Raoof kept only 40% to 45% of the collections of the practice. This control provided Bazzi and El-Sayed with: (a) the ability to train Dr. Raoof's staff on how to refer patients for physical therapy; and (b) leverage to pressure Dr. Raoof to prescribe physical therapy to "build the case up" although Dr. Raoof was "uncomfortable" and felt that the arrangement "morally [did not] sound right."

76.    Similarly, the Management Group owned and controlled Medical Evaluations. Dr. Milliner was an independent contractor at Medical Evaluations and, through this arrangement in which Dr. Milliner paid nothing to use the facility, equipment and staff, El-Sayed provided patients, and the Management Group pressured Dr. Milliner to prescribe therapy and send patients to Pointe. After a month "it stopped feeling right" for Dr. Milliner because some patients had been in minor accidents and he did not understand why they needed therapy. In the case of Dr. Schoolfield, El-Sayed influenced the doctor to send patients to New Era through a false representation that an insurance company rule required treatment at New Era.

77.    Similarly, Dr. Lutwin, who worked at Medical Evaluations, testified that Medical Evaluations handles only "accident cases," gets patient referrals from attorneys, and that among the attorneys who sent him a lot of patients was LegalGenius, though he did not know who they were. Lutwin described his arrangement as one in which he treats patients and bills under his own name and

does not pay rent for his use of space.  Rather, in exchange for rent-free space, Lutwin refers patients for physical therapy to physical therapy facilities owned by the owners of Medical Evaluations.  As he stated, Medical Evaluations "own[s] a bunch of physical therapy places," and they "get the physical therapy" out of the arrangement.  All of Irwin's patients got physical therapy.  Each patient may be given a sheet of paper with different facilities from which to choose, but patients usually end up at "one of the Medical Evaluations facilities" because "that's the payment for [his] rent."

78.    In addition to steering patients to the Treatment Facilities, the Management Group also generated referrals for other medical services from which they stood to profit either directly or indirectly.  For example, Dr. Raoof testified that "Amanda" trained Dr. Raoof's staff on how to refer patients not only for physical therapy but for MRIs and electrodiagnostic testing.  Dr. Milliner testified that when he ordered MRIs, El-Sayed sent all the patients to Bio-Magnetic, which is owned by Gunabalan.  Dr. Schoolfield explained that El-Sayed provided his clinic with disability certificate forms and Dr. Schoolfield would later learn that, based on these disability certificates, patients were being transported through a transportation company connected to El-Sayed.

79.    Dr. Schoolfield also explained that El-Sayed patients were prescribed MRIs and other diagnostic testing that El-Sayed was involved in providing.  As

discussed above, El-Sayed arranged for Hoban to work for Dr. Schoolfield at IMA and provided him with patients to treat. Hoban worked at both IMA and Mundy. Many of Hoban's patients, whose treatment at the Treatment Facilities was billed to State Farm, had MRIs at Biomagnetic. Indeed, 20 out of the 30 patients identified in Exhibit 2 that Hoban purported to examine at IMA were sent to Biomagnetic for MRIs despite that Flint is more than 50 miles from the Biomagnetic MRI facility.

80.    Based upon the similarities in the structure, associated individuals, and activities of Pinnacle, Medical Evaluations, Choice, Mundy, Pointe and New Era, it appears that the Prescribing Physicians and Prescribing Clinics had the same or similar arrangement with El-Sayed and Amanda Bazzi, pursuant to which the Prescribing Physicians and Prescribing Clinics fraudulently prescribed medically unnecessary physical and occupational therapy for patients of the Treatment Facilities, in return for which the Management Group steered patients to the Prescribing Physicians and Prescribing Clinics for examinations, and either split the fees or allowed the Prescribing Physicians to collect their own bills without incurring any costs, such as for rent, staff or equipment.

### 3.    Fraudulent Initial And Follow-Up Examinations And Diagnoses, And Treatment Plans

81.    The Prescribing Physicians and Prescribing Clinics' role is essential to the scheme. Under Michigan law, physical therapy services can only be performed

if a licensed health care provider, such as a medical doctor, prescribes the services. *See* Mich. Pub. Health Code § 333.17820(1).   Moreover, physical therapy prescriptions expire after 90 days, so if therapy is to continue beyond this point, a new prescription is required.  *See* 2010 Mich. Admin. Code R. 338.7122.  As such, the Treatment Facilities rely on the Prescribing Physicians and the Prescribing Clinics to prescribe physical therapy services.  Without these prescriptions, the Treatment Facilities would lose their only source of revenue.

82.    Accordingly, the first step in the Predetermined Protocol is an initial examination by one of the Prescribing Physicians or another physician employed by and associated with the Prescribing Clinics, after which treatment at the Treatment Facilities is inevitably prescribed.  Based on the initial examination findings, the Prescribing Physicians and other physicians employed by and associated with the Prescribing Clinics diagnose patients with sprains and strains of the cervical, thoracic and/or lumbar regions of the back, as well as other conditions.  *See* Ex. 9.  In the majority of cases, patients are diagnosed with conditions in at least two regions of the spine.  *See* Exs. 1 and 2.  The Prescribing Physicians then prescribe physical therapy for the patients they examine, prepare reports summarizing their examinations, and issue prescriptions for treatment at the Treatment Facilities. The Prescribing Physicians routinely specify that physical

therapy should be provided three times per week for four weeks. *See* sample prescriptions, attached as Ex. 10.

83. In approximately early 2010, when Pointe hired an occupational therapist and then in approximately October or November 2010, when the occupational therapist began working at New Era, the Predetermined Protocol was modified at the respective facilities to include occupational therapy. Although a prescription is not required under Michigan law to perform occupational therapy, the Prescribing Physicians and Prescribing Clinics began to prescribe both physical and occupational therapy services. *See* Exs. 1 and 2. Significantly, none of the patients of Pointe whose treatment was billed to State Farm were prescribed occupational therapy before February 2010, and none of the patients of New Era whose treatment was billed to State Farm were prescribed occupational therapy before October 2010. *See* Exs. 1 and 2. Such occupational therapy was purportedly prescribed to treat primarily cervical or upper sprains and strains and also purported head trauma, headaches and closed head injuries. Despite the fact that headaches and closed head injuries caused by an automobile accident typically appear at or about the time of the accident, in many instances, patients were not diagnosed with headaches or closed head injuries until later, were only diagnosed with such injuries after another examination in which there had been no indication of such an injury, and were, in fact, diagnosed with such injuries to justify

occupational therapy. *See* Ex. 3. Occupational therapy services were not added to the Predetermined Protocol for the benefit of patients, but rather, to financially enrich Defendants by generating higher profits. The diagnoses are not credible and reflect a predetermined justification for occupational therapy because: (a) if they had been legitimate conditions they would have manifested themselves earlier; (b) if they had been legitimate there should not have been earlier diagnoses that omitted any reference to such a condition; and (c) it is unlikely that patients suffered from such conditions given that the majority of the Treatment Facilities' patients reported no injuries or minor injuries at the time of the accident and many did not seek emergency room care.

84. Indeed, in the case of patient NA, the patient showed no sign of headaches or head trauma during initial and follow-up evaluations performed by an unrelated provider on May 10, 2010 and May 17, 2010. *See* Ex. 11. To the contrary, the provider noted that the patient was involved in an accident on April 23, 2010 and expressly reported that, according to the patient, there was "[n]o head injury or loss of consciousness" and, based on the provider's examination, there were "[n]o headaches, no [head] swelling, no [head] injuries." *See id.* Nevertheless, on May 20, 2010, just days later and almost a month after the accident, Dr. Quiroga purported to conduct an initial examination of patient NA, reported that "the patient has had posttraumatic headaches approximately four

episodes a week lasting one to two hours," and diagnosed the patient with "Posttraumatic headaches." *Id*. Dr. Quiroga then recommended "[p]hysical therapy and occupational therapy three sessions a week x4 weeks." *Id.* If the head injury had been legitimate and caused by the automobile accident, it likely would have been observed shortly after the accident. Further, Dr. Quiroga's report and findings directly contradict the patient history and findings of the earlier provider, which explicitly noted the patient did not suffer from such a condition.

85.    Another patient who purportedly received occupational therapy, SH, testified that she did not receive occupational therapy and that Rutledge provided physical therapy.

86.    In approximately September 2011, occupational therapist Rutledge stopped working at New Era, and in June 2012 stopped working at Pointe. As a result, patients stopped receiving occupational therapy at the Treatment Facilities. In many instances, patients who had purportedly received occupational therapy to the cervical region continued receiving the same treatment which was simply recharacterized as physical therapy to the cervical region.

87.    In support of the continuation of physical therapy and occupational therapy, and also to justify charges for additional examinations by the Prescribing Physicians and Prescribing Clinics, after a period of physical therapy and/or occupational therapy, patients are subjected to purported follow-up visits with the

Prescribing Physicians and Prescribing Clinics.  Like the initial examinations, these follow-up visits involve, at most, cursory exams of the patients to support pre-determined prescriptions for a continuation of the treatment at the Treatment Facilities.  Some reports of these follow-up visits purport to indicate slight improvement in the patients, while others show no improvement at all.  But virtually every report identifies conditions that require continuation of the Predetermined Protocol, despite the fact that the patients have purportedly undergone extensive treatment at the Treatment Facilities.

88.    In most instances, documentation prepared by the Prescribing Physicians, Prescribing Clinics and others associated with the Prescribing Clinics, and submitted to State Farm includes: (a) reports of initial examinations; (b) reports of follow-up visits; and (c) prescriptions.  Such documentation reflects that Prescribing Physicians and those employed by and associated with the Prescribing Clinics were not providing individualized diagnoses and treatment, but rather were conducting, at most, cursory examinations and issuing predetermined prescriptions to support the continuation of the Predetermined Protocol.

89.    A similar prescription form, with similar fields, was used by the Prescribing Physicians and those employed by and associated with the Prescribing Clinics.  *See* sample prescriptions, Ex. 10.  Prescriptions for physical therapy and occupational therapy typically ordered treatment three times per week for four

weeks.  Indeed, the order was so common that some prescription forms had the directive for three times per week for four weeks already printed on the form, and some also included the physician's name pre-printed on the form so that the Prescribing Physicians would not even need to take the time to sign the forms.  *See* Ex. 12.

90.    The prescription forms often included fields in which a diagnosis could be indicated.  On occasions when these fields were completed, limited and vague descriptions were used, and reflected diagnoses of sprain or strain of the cervical, thoracic and/or lumbar region of the spine.  In most instances, patients were diagnosed with conditions in at least two regions of the spine and in many instances, three regions of the spine.  *See* Exs. 1 and 2.  When prescriptions were written for occupational therapy, the diagnoses on the prescriptions sometimes also included references to head trauma, headaches and closed head injuries or "CHI," purportedly to provide further support for both occupational therapy and physical therapy.  *See* Ex. 3.  Indeed, many patients of the Treatment Facilities whose treatment was billed to State Farm and who were diagnosed with head injuries were first diagnosed with such injuries in the first half of 2010, and many of these patients were then prescribed occupational therapy.  *See* Ex. 3.

91.    Prescriptions for physical therapy and/or occupational therapy were regularly renewed, with the renewed prescriptions following the same boilerplate

diagnoses and directive for therapy of three times per week for four weeks. Diagnoses varied little among patients and changed little for individual patients over the course of their treatment despite the fact that one would expect to see individualized diagnoses and treatment and some change in patients' conditions over time.

92.    Additionally, initial evaluations and follow-up examinations reflect the complete failure to provide appropriate, individualized care.   Incomplete histories are reported, if they are taken at all, reflecting failures to inquire about sensory complaints and weakness or to record information from previous providers or testing.   On frequent occasions, there is no correlation between and among patient diagnoses rendered in the emergency room, initial examinations or follow-up examinations performed by the Prescribing Physicians or initial examinations preformed at the Treatment Facilitates.   Unnecessary diagnostic tests, such as MRIs, are ordered and performed although:  (a) there is no justification for the tests in the reported physical findings;  and (b) there is no change in treatment as a result of the testing.   Despite the fact that the Prescribing Physicians failed to provide individualized care and their initial and follow-up examinations served no purpose other than to justify unnecessary physical and occupational therapy and additional testing, the Prescribing Physicians and Prescribing Clinics submit bills to State

Farm for their initial and follow-up examinations, examples of which are attached as Ex. 13.

93.     Additionally, the Prescribing Physicians routinely sign disability certificates, examples of which are attached as Ex. 8, pursuant to which they find patients to be partially or totally disabled, and restrict standing, sitting, bending/twisting, pulling/pushing, lifting, housekeeping activities, and/or driving. *See also* Exs. 1 and 2.

### a.     Gunabalan Documentation

94.     In addition to Gunabalan's his role in the Management Group, pursuant to which he owned and/or controlled the Prescribing Clinics, Treatment Facilities, and Bio-Magnetic, Gunabalan also occasionally examined patients who he referred to the Treatment Facilities.  From approximately June 2008 through at least March 2010, Gunabalan has purported to perform initial examinations and follow-up visits on patients who treated at the Treatment Facilities.  *See* Ex. 14.  In those instances, Gunabalan usually purports to diagnose patients with conditions in at least two regions of spine or parts of the back.  *See* Exs. 1 and 2.  The reports conclude that patients suffer from sprains or strains and may suffer from radiculopathy in at least two regions of the spine, as well as other conditions. Gunabalan's reports recommend, among other things, the commencement or continuation of therapy.

95.     The prescriptions that Gunabalan wrote for therapy that was billed to State Farm by the Treatment Facilities were for treatment to be provided three times per week for four weeks.  Such prescriptions diagnosed strains in at least two regions of the spine and direct the therapist to evaluate and treat those areas.  *See* Ex. 16.  In addition, in order to support treatment by the occupational therapist who was hired by Pointe in early 2010, Gunabalan also prescribed occupational therapy in addition to physical therapy beginning in February 2010.  Occupational therapy was not prescribed for Pointe patients before the occupational therapist began working there.  *See* Exs. 3 and 16.

### b.     Quiroga Documentation

96.     From approximately March 2010 through at least December 2012, Dr. Quiroga has purported to perform initial examinations and follow-up visits on a significant number of patients treated at the Treatment Facilities.  *See* Ex. 15.  Dr. Quiroga purports to diagnose many patients with conditions in all three regions of the spine (cervical, thoracic and lumbar), and virtually every patient is diagnosed with symptoms in at least two regions.  *See* Exs. 1 and 2.  In many instances, pain is purportedly reported at between five and eight on a scale of ten, in which ten is the most severe pain and one the least severe, and in most instances such pain is described as radiating down at least one extremity.  The majority of patients are reported to have paraspinal muscle spasms, spinous process tenderness, positive

straight leg raises at between 30° and 45° meaning pain is produced when the leg is lifted to that angle, and decreased flexion and extension.  Many patients also have positive Spurling test results, which is indicative of radiculopathy in the cervical spine. The reports routinely conclude that patients suffer from sprains or strains and may suffer from radiculopathy in at least two and often three regions of the spine, as well as other conditions.  Dr. Quiroga's reports typically conclude by recommending, among other things, the commencement or continuation of therapy, and state, often in identical or substantially similar language, that "goals [are to] be restoration of motor deficits, reduction of pain, and increased range of motion." *See, e.g.*, Ex. 15.

97.    Virtually every prescription that Dr. Quiroga wrote for therapy that was billed to State Farm by the Treatment Facilities was for treatment to be provided three times per week for four weeks.  Indeed, many have this directive pre-printed on the form along with Dr. Quiroga's name.  Virtually all of his prescriptions for physical therapy diagnose strains and/or radiculopathy in at least two and in many cases three regions of the spine and direct the therapist to evaluate and treat those areas.

98.    In addition, in order to support treatment by the occupational therapist who was hired by Pointe in 2010, Quiroga prescribed occupational therapy for Pointe patients beginning in approximately September 2010.  *See* Ex. 1.  When the

48

occupational therapist began working at New Era in approximately October or November 2010, Quiroga began prescribing occupational therapy for New Era patients in October 2010. *See* Ex. 2. Occupational therapy was not prescribed for any of the Treatment Facility patients before the occupational therapist began working at each of the respective facilities. *See* Exs. 1 and 2. Some of Quiroga's occupational therapy prescriptions are directed towards cervical or upper spine conditions, and many purport to justify the occupational therapy treatment by identifying head injuries such as "post traumatic h.a. [headach]," "post concussive H.A.," or "post MVA H/A." *See* Exs. 3 and 16.

### c.    Ruden Documentation

99.    From approximately May 2009 through at least July 2012, Dr. Ruden has purported to perform initial examinations and follow-up visits on a significant number of patients who treated at the Treatment Facilities. *See* Ex. 17. Like Dr. Quiroga, Dr. Ruden purports to diagnose many patients with conditions in at least two regions of the spine or body. *See* Ex. 1. In some instances, he prepares only prescriptions and does not even summarize his examinations in a report. In those instances where he does summarize his examinations, he describes patients suffering from pain and strains or sprains in at least two regions of the spine. Many patients are also reported to have paraspinal tenderness and decreased range

of motion.  Dr. Ruden's reports conclude by recommending, among other things, the commencement or continuation of therapy.

100.  Most prescriptions that Dr. Ruden wrote for therapy that was billed to State Farm by the Treatment Facilities were for treatment to be provided three times per week for four weeks.  His prescriptions for physical therapy diagnose strains and/or radiculopathy in at least two regions of the spine and direct the therapist to evaluate and treat those areas.  Indeed, many have this directive pre-printed on the form along with the doctor's name.

101.  In order to support treatment by the occupational therapist who was hired by the Treatment Facilities in 2010, Dr. Ruden prescribed occupational therapy in addition to physical therapy beginning in November 2010.  Some of these occupational therapy prescriptions purport to justify the occupational therapy treatment by identifying head injuries and direct treatment and evaluation of these areas.  *See, e.g.*, Ex. 3.

### d.    Beale Documentation

102.  From approximately April 2009 through at least September 2013, Dr. Beale and physicians employed by and associated with his professional corporation, Medical Evaluations, purported to perform initial examinations and follow-up visits on patients who treated at the Treatment Facilities.  *See* Ex. 18. Dr. Beale purports to diagnose the majority of patients he treated for whom the

Treatment Facilities billed State Farm with conditions in at least two regions of the spine.  Many of these patients also suffered tenderness and decreased range of motion and were diagnosed with various forms of sprains.  Dr. Beale then prescribes a treatment plan that includes physical therapy and regularly concludes that the patient is disabled from "bending, lifting, twisting, turning, pushing, pulling and squatting," and needs to be re-evaluated in four to six weeks.  Dr. Beale also prescribes MRIs.  *See* Ex. 27.  Beginning in 2010, after Pointe hired an occupational therapist, Beale also began to diagnose patients with head injuries and his reports begin to reflect that the patients suffer from headaches and his recommendations and treatment plans include directives for "CLOSED HEAD INJURY EVALUATION" or "MONITOR THE HEADACHES."  *See* Ex. 3.

103.   Most prescriptions that Dr. Beale wrote for therapy that was billed to State Farm by the Treatment Facilities were for treatment to be provided three times per week for four to eight weeks.  Most of these prescriptions diagnose conditions in at least two regions of the spine.

104.   In order to support treatment by the occupational therapist who was hired by Pointe in 2010, Dr. Beale also prescribed occupational therapy in addition to physical therapy beginning in June 2010.  *See* Exs. 1 and 2.  Dr. Beale prescribed occupational therapy in addition to physical therapy by issuing physical therapy prescriptions in which he simply added "OT" as additional treatment, or

blanket prescriptions designated as "Prescriptions for Physical and Occupational Therapy." Occupational therapy was typically prescribed for patients with cervical or upper spine issues or for patients with head injuries, and was not prescribed for Pointe patients before the occupational therapist began working there.

### e. Hoban Documentation

105. From approximately January 2008 through at least January 2014, Hoban has purported to perform initial examinations and follow-up visits on patients who treated at New Era I and II. *See* Ex. 19. Based on his initial examination findings, Hoban diagnoses patients with sprains and strains of the cervical and/or lumbar regions of the back, as well as other vague conditions, such as "whiplash-type injury." *See id.*

106. The documentation that Hoban submits to State Farm typically consists of a one-page report and sometimes even shorter, which establishes that Hoban fails to properly examine the patients because he does not perform reflex, motor or sensory testing, and does not quantify limitations, if any, to range of motion, if he documents range of motion at all. Other pervasive patterns in Hoban's reports include: (a) chief complaints of pain in the neck and/or back, that are general and non-specific; (b) minimal or complete lack of any medical or surgical history; (c) a failure to review systems; (d) lengthy narrative descriptions of the motor vehicle accident consistent with a lack of fault on the part of the

patient; (e) routine prescriptions for narcotic pain medication; (f) a failure to perform and/or document neurological exams even where patients complain of tingling or numbness in their hands; (g) instructions for the patient to return in four weeks; and (h) statements that appear to be designed to rebut malingering allegations, such as that a patient "is a very good patient who does not exaggerate her complaints," "states, and I believe her, that she is not able to work," or "is not a malingering patient."

107.   It is predetermined that Hoban will prescribe "physiotherapy" two to three times per week for four weeks.   In addition, in order to support treatment by the occupational therapist who began working at New Era in approximately October or November 2010, Hoban also began to prescribe occupational therapy for patients in early 2011.   Occupational therapy was typically prescribed for patients with cervical or upper spine issues, and was not prescribed for New Era patients before the occupational therapist began working there.

108.   Additionally, Hoban routinely signs Disability Certificates, examples of which are attached as Ex. 20, pursuant to which he finds patients to be partially or totally disabled, and restricts standing, sitting, bending/twisting, pulling/pushing, lifting, housekeeping activities, and/or driving. *See* Ex. 2.

109.   Thereafter, Hoban purports to re-examine the patient the following month, at which point he renders the same predetermined diagnosis, and sends the patient back to the New Era for another four weeks of the same physical therapy.

### 4.   The Prescribing Physician's Prescriptions Were Not Based On The Patients' Unique Needs

110.   Many of the Prescribing Physicians' prescriptions resulted in therapy being prescribed and provided in some cases for up to a year or more.  *See* Exs. 1 and 2.  Indeed, in the case of some New Era patients, treatment continued for multiple years.  *See* Ex. 2.  There was no justification for physical therapy or occupational therapy to continue for so long, and certainly not in the vast majority of cases, given that legitimate treatment for individuals with strains and sprains often involves no treatment at all because many of these kinds of injuries heal within weeks without any intervention, and even where such treatment is appropriate it typically requires no more than four to six weeks.

### 5.   The Fraudulent Physical Therapy And Occupational Therapy Examinations And Treatment

111.   After patients receive their physical therapy prescriptions and/or occupational therapy prescriptions from the Prescribing Physicians, the Prescribing Clinics, or another physician, they begin the Predetermined Protocol at either Pointe or New Era.   Regardless of whether the patient goes to Pointe or New Era,

on the first visit, each patient is purportedly examined by one of the Treatment Facilities' physical and/or occupational therapists.

112.   Patients typically begin physical and/or occupational therapy the same day that the initial evaluations are purportedly performed, if they receive therapy at all.  A number of individuals have reported that they did not receive some or all of the treatment for which the Treatment Facilities billed.  For example, patient WJ, for whom New Era billed massage at least 49 times, testified that she never received massage.  In addition, as set forth in paragraph 85 above, a patient who purportedly received occupational therapy testified to not having received occupational therapy services.

113.   Although it is well-established that stretching and physical exercise are the primary forms of rehabilitation for soft tissue injuries of the neck and back, the Predetermined Protocol is heavily reliant on passive modalities that permit the Treatment Facilities to maximize profits by submitting multiple charges for multiple modalities purportedly performed on each visit.

114.   On most visits to the Treatment Facilities, patients purportedly receive the same five modalities, namely (a) hot and/or cold packs, (b) electrical stimulation, (c) ultrasound, (d) therapeutic exercise, and (e) massage or manual therapy.  *See* Exs. 1 and 2.  The Treatment Facilities provide the foregoing modalities, if they provide them at all, pursuant to the Predetermined Protocol and

to increase the charges they can submit to and collect from State Farm. Indeed, while any one of these treatment modalities might be medically necessary for a particular patient on a particular day, this comprehensive combination of treatments is seldom, if ever, medically necessary for any patient on any day, let alone on most visits.

115.   In addition, beginning in early 2010, at Pointe and in approximately October or November 2010 at New Era, some patients would purportedly be subjected to certain of the regular passive modalities – most commonly hot and/or cold packs and electrical stimulation – twice on each visit, once by a physical therapist and once by an occupational therapist. This was not done to benefit the patient, but to allow the facilities to double-bill for these modalities. Patients for whom double-billing occurred are identified in Exhibits 1 and 2. Moreover, the addition of an occupational therapist resulted in the Treatment Facilities purporting to provide and bill for yet another service, self-care training, which had never been provided or purportedly needed before the occupational therapist arrived and was never provided or apparently needed after she left the respective Treatment Facilities. *See* Exs. 1 and 2.

116.   Indeed, there is no legitimate medical explanation for the Treatment Facilities' provision of the same modalities by an occupational therapist and physical therapist on the same date of service to different parts of the body.

Licensed physical therapists and licensed occupational therapists can provide therapy to the entire body.  Despite this fact, therapists employed by the Treatment Facilities have repeatedly testified that they were instructed to employ a division of labor whereby the physical therapist treated the lower portion (from the waist down), and the occupational therapist treated the upper portion (from the waist up). No therapist has been able to provide a medical explanation for this practice. Moreover, as set forth above, patients who purportedly received occupational therapy have testified that they did not know they were receiving these services and thought Rutledge was a physical therapist.  In fact, this division of labor between the physical therapist and occupational therapist served no purpose other than to financially enrich Defendants by allowing them to double-bill for the same modalities allegedly provided to the same patient on the same day.

117.   In approximately November 2011, the occupational therapist Rutledge stopped working at New Era and, in approximately June 2012, stopped working at Pointe.  As a result, the Treatment Facilities stopped providing occupational therapy services to the patients of these facilities after these dates and many patients who had purportedly received occupational therapy to the cervical region began receiving the same treatment which was then characterized as physical therapy to the cervical region.

118.   Although soft-tissue injuries often resolve themselves within a matter

of weeks without any intervention, most patients purport to treat at the Treatment Facilities for well beyond the commonly accepted treatment period for soft tissue injuries of four to six weeks.  Many patients have stated that despite their extensive physical and/or occupational therapy, their physical condition did not improve. Moreover, patients were rarely discharged.

119.   To support the Treatment Facilities' charges for the physical therapy and occupational therapy, the Treatment Facilities create and submit to State Farm (a) Plans of Treatment for Outpatient Rehabilitation ("Plans of Treatment"); (b) Updated Plans of Progress for Outpatient Rehabilitation ("Updated Plans"); (c) physical therapy and occupational therapy Treatment Records and Progress Notes ("Progress Notes"); and (d) check lists purporting to reflect particular modalities administered to patients on particular days over a week ("Check Lists").   The information in these documents is predetermined and the forms are fraudulent. Sample Plans of Treatment and Updated Plans are attached as Ex. 21.   Sample Progress Notes and Check Lists are attached as Ex. 22.

120.   For example, New Era employees have testified that they were instructed to prepare weekly reports, as opposed to daily reports, were told not to document pain levels, and were not permitted to maintain the therapists' daily handwritten notes in the file.   As a result, the weekly notes did not accurately reflect the patients' conditions.   Indeed, one employee testified that there was a

58

"master note" that came from another clinic where Joshi had worked that he loaded onto the computer, and instructed employees to use for the patients at New Era. Specifically, Joshi instructed employees on how many modalities patients needed to have as a matter of course, and provided them with a document setting forth how to break down the modalities per week, and what information to add to the weekly notes. Employees were not allowed to use their training, knowledge, or experience to formulate complete and accurate notes.  Moreover, although Joshi did not typically provide physical therapy for the patients at New Era I, he directed treatment by not only instructing employees to add more modalities to the patients' treatment plans, but by refusing to allow patients to be discharged.  Finally, Joshi instructed untrained technicians at New Era I to provide electrical stimulation and ultrasound to patients, even though they were not permitted by law to provide these modalities.

121.  Consistent with the foregoing employee testimony, Plans of Treatment and Updated Plans are similar forms and contain similar information though the former was typically prepared on the patients' first visit to the Treatment Facility, while the latter was prepared periodically as the treatment continued.  Both forms typically included a description of the patients' diagnoses, short term goals, long term goals, a plan to accomplish such goals and an assessment of the patient.  While these forms should have reflected individualized

treatment of patients, they in fact vary little from patient to patient or over the course of any one patient's care, and all are designed to establish that the patient is an excellent candidate for therapy.  In the description of goals and the initial assessment, many forms indicate that the patient suffers from significant pain between level six and nine on a scale of one to ten, with ten being the most severe and one being the least severe.  Pain is reported in at least two but often three regions of the spine, thus purporting to justify treatment of the entire body. Remarkably, in many instances, the locations and level of pain identified differ from that which has previously been recorded by the Prescribing Physicians and Prescribing Clinics in their reports.  While Updated Plans periodically show changes in the level of pain, rarely if ever is pain reduced to the point that care may be suspended.

122.  The Plans of Treatment and Updated Plans repeatedly use the same phrases and descriptions.  For example, reports at both New Era and Pointe purport to document that: (a) patients often have tenderness at multiple levels ranging from level two to four on a scale of one to five in which five is the most severe; (b) patients often have spasms ranging from level two to four on a scale of one to five in which five in the most severe; (c) patients have limitations in range of motion due to pain; and (d) patients have difficulty with a variety of tasks including getting up from a low height chair, going up and down stairs, sleeping on their

sides for a period time, lifting objects, sitting and watching television for a period of time, grooming and bathing and reaching. Many patients were recorded to have a four out of five level of spasm during the treatment, which supposedly improved over the course of treatment to three out of five. Similarly, many patients were recorded to have a four out of five level of tenderness, which supposedly improved over the course of treatment to three out of five. Despite that the New Era and Pointe reports purport to document spasms and tenderness by scale, no generally accepted scale exists for spasms or tenderness. In 2010, after the Treatment Facilities had employed an occupational therapist, the documents also began to report headaches, often severe, accompanied by complaints of pain of at least seven out of ten on a scale of one to ten with ten being the most severe.

123. Both forms contain a plan of treatment that invariably includes not only the same modalities – hot and/or cold packs, electrical stimulation, ultrasound, therapeutic exercise and manual therapy – but in many cases provide that each such modalities should be administered for the same amount of time, specifically, ultrasound for "6 to 8 minutes," electrical stimulation for "15 to 20" minutes, therapeutic exercise for "15 to 30 minutes," and massage or manual therapy for ten minutes. The reports conclude by noting that the patient has "good rehab potential and would benefit from . . . skilled therapy . . . 2-3 times a week for 4 weeks to achieve set goals." Despite the fact that the Updated Plan is prepared

after the patient has purportedly undergone a period of treatment, these forms virtually always indicate that, to date, long term goals are "not met" and it is necessary to "continue services." Nevertheless, changes are not made to the treatment plan.

124. Plans of Treatment and Updated Plans provide for review by a physician who is required to sign and "certify the need for these services furnished under this plan of treatment and while under my care." The Plans were reviewed by the Prescribing Physicians, physicians employed by and associated with the Prescribing Clinics, including Gunabalan, and in most instances contain the physician's signature. In this way, the Prescribing Physicians and physicians employed by and associated with the Prescribing Clinics were fully aware of and authorized the Predetermined Protocol that was being applied to their patients' care. As Gunabalan himself testified, the Plans reflect "what the therapist recommended and the doctor generally agrees and signs off," but if the doctor does not believe the plan or the modalities involved are appropriate or necessary "he may change it." State Farm is not aware of any situation where Gunabalan or any other Prescribing Physician changed a patient's treatment plan.

125. Remarkably, on some occasions, physicians who were not even involved in a particular patient's care signed the plans. Gunabalan himself admitted that he signed several plans for the therapy for a patient that he never

treated, including one that was dated before that patient had been examined by any physician.  Indeed, on occasions, Gunabalan signed plans before the occupational or physical therapist evaluated the patient on the first or "start of service" date ("SOC" date), and he admitted in testimony to having signed treatment plans where he had not even seen and was not treating the patient.  *See* Ex. 23.

126.  Physical therapy and occupational therapy Progress Notes, and corresponding Check Lists, purport to reflect particular modalities administered to patients on particular days over a week.  The Progress Notes also include patient assessments.   Significantly, whether the forms reflect physical therapy or occupational therapy, they document predominately passive modalities and in most instances of physical therapy patients receiving hot and/or cold packs, electrical stimulation, ultrasound, therapeutic exercise and massage or manual therapy and in most instances of occupational therapy at least hot and/or cold packs, electrical stimulation, and ultrasound and also often therapeutic exercise and manual therapy. When the documents reflect exercises, in the majority of cases they do not document what exercises are purportedly performed.

127.  Assessments in the Progress Notes closely mirror those in the Plans of Treatment and Updated Plans.  Like the assessments in the Plans, assessments in the Progress Notes purport to document that (a) patients often have tenderness at multiple levels ranging from level two to four on a scale of one to five in which

five is the most severe; (b) patients often have spasms ranging from level two to four on a scale of one to five in which five in the most severe; (c) patients have limitations in range of motion due to pain; and (d) patients have difficulty with a variety of tasks, including getting up from a low height chair, going up and down stairs, sleeping on their sides for a period time, lifting objects, sitting and watching television for a period of time, grooming and bathing and reaching.  Despite the fact that the New Era and Pointe Progress Notes purport to document spasms and tenderness by scale, no generally accepted scale exists for spasms or tenderness.  In 2010, after the Treatment Facilities had employed an occupational therapist, the documents report headaches, often severe, with complaints of pain at between seven and ten on a scale of one to ten with ten being the most severe.

128.   The above-described patterns in the Plans of Treatment, Updated Plans, Progress Notes, and Check Lists are not credible as it is not possible that so many patients would suffer from identical conditions, require identical care, and not demonstrate a greater level of improvement over the course of treatment.

129.   Based on the treatment purportedly reflected in these records, the Treatment Facilities submit bills to State Farm for payment.  These bills and the supporting documentation are part of a fraudulent scheme because: (a) the purpose for providing the same combination of treatments on almost every visit is because they are part and parcel of a Predetermined Protocol, not because they are

medically necessary for the patients; and (b) they represent that services were rendered when they were not.

130.   Since Michigan has no dollar limit on no-fault benefits, the pattern of re-diagnosis by the Prescribing Physicians and Prescribing Clinics and re-evaluation by the Treatment Facilities, followed by a barrage of unnecessary and redundant treatment modalities, generally continues on indefinitely until: (a) the patient finally refuses further treatment; (b) an independent medical examination determines further treatment is not medically necessary; or (c) the patient resolves his claim.   Defendants' fraudulent referral cycle – diagnosis by Prescribing Physicians and Prescribing Clinics, fraudulent evaluation and treatment at the Treatment Facilities, and then back for another fraudulent diagnosis – typically lasts as long as the No-Fault benefits continue to flow.

### 6.    MRIs

131.   The ordering and performance of medically unnecessary MRIs is another component of Defendants' scheme.  The Prescribing Physicians and other physicians at the Prescribing Clinics wrote prescriptions for MRIs and sent patients to the MRI Facility owned and controlled by Gunabalan, namely Bio-Magnetic.

132.   Gunabalan and physicians acting under his direction at the Prescribing Clinics referred patients of the Prescribing Clinics to the MRI Facility in which Gunabalan has an ownership interest, namely Bio-Magnetic.   In addition,

Gunabalan and the Prescribing Physicians and Clinics also sent patients to another MRI Facility that Gunabalan owns and/or controls, Michigan Biotech Partners LLC ("Michigan Biotech"). Michigan Biotech operates under an assumed name, The Imaging Center, though it submits bills under the name Michigan Biotech and from Bio-Magnetic's address at 30781 Stephenson Highway, Madison Heights, Michigan. *See* Ex. 24. Michigan Biotech d/b/a The Imaging Center and Bio-Magnetic are part of a single group of MRI Facilities referenced on a common webpage and on reports of MRI results, with the webpage and National Plan and Provider Enumeration System identifying Gunabalan as President of the group. *See* Ex. 25.

133. These MRIs were medically unnecessary and part of the protocol applied to patients of the Treatment Facilities. MRIs are advanced imaging procedures that should only be performed after an individualized determination is made on each patient that it is medically necessary. For example, MRIs may be ordered when a patient's diagnostic picture is particularly unclear, response to treatment is atypical or not significant, and legitimate concerns about structural damage to the patient exist. When MRIs are ordered, they should be limited to the targeted body part or area of interest. It is thus uncommon to order MRIs on all regions of the spine or often more than one region.

134.   When MRIs are clinically indicated and ordered by a physician, he or she should evaluate the significance of the MRI interpretations and incorporate those findings into ongoing or future treatment plans.   Specifically, physicians must seek clinical corroboration as to whether any of the identified abnormalities in the MRI interpretations are preexisting and/or pose any clinical significance to the patient.   For instance, it is well-established that many of the abnormalities identified in MRI reads have no clinical significance and result in no identified symptoms for the patient.   In addition, many abnormalities in MRI radiological reports are related to patients' normal aging process or are of a historical nature and have no correlation with any acute injury.   As a result, it is important for the physicians treating a patient for an acute injury to differentially determine which, if any, abnormalities in MRI radiological reports are related to the presenting symptoms and/or any acute injury, and then to adjust the patient's treatment accordingly.

135.   The above-described process of examination, diagnosis, and treatment must be documented for the benefit of:  (a) the licensed professionals involved in the patient's care; (b) other licensed professionals who may treat the patient contemporaneously or subsequently; (c) the patients themselves whose care and condition necessarily depends on the documentation of this information; and (d)

payors such as State Farm and other insurers who must pay for reasonable and necessary treatment.

136.   MRIs were ordered on patients of the Prescribing Physicians and Prescribing Clinics without clinical justification and nothing in initial examination reports or reports of follow up visits of patients contained documentation that justified them.  Rather, in many instances, MRIs were ordered based on nothing more than patient complaints of pain.  Patient charts do not reflect the taking of an adequate history or the performance of an adequate examination that might identify an objective basis to support the need for an MRI.

137.   Additionally, patients received multiple MRIs and, in many instances, MRIs were ordered and performed on multiple regions of the spine.  *See* Ex. 27.

138.   MRI results also did not alter or affect patient treatment.  Regardless of whether the results were normal or abnormal, therapy provided by the Treatment Facilities continued unaltered.

139.    Patients of the Treatment Facilities were sent to the MRI Facility from May 2009 until at least June 2011, and the Management Group played a role in steering patients to these facilities.  As discussed above, Dr. Raoof testified that "Amanda" trained Dr. Raoof's staff on how to refer patients not only for physical therapy but for MRIs.  Dr. Raoof further stated, "Sharif Elsayed always used to tell me you have to build the case" which meant that after a certain number of office

"visit[s], then start ordering expensive tests" including MRIs.  Dr. Milliner testified that when he ordered MRIs, El-Sayed sent all the patients to Bio-Magnetic.  Dr. Schoolfield explained that El-Sayed patients were prescribed MRIs that El-Sayed was involved in providing.

140.   The referrals and performance of unnecessary MRIs are highly lucrative because the charges by Bio-Magnetic are exorbitant.  Specifically, the MRI Facility regularly charged over $5,000 for MRIs performed on each spinal region.  Thus, MRIs of multiple regions of the spine or parts of the body typically result in charges over $10,000.  *See* Ex. 27.  Such charges are not only enormous but are several times higher than hospitals in the same geographic areas charge for the same services.

### 7.    Injections

141.   In addition to the provision of unnecessary MRIs, patients who treated at the Treatment Facilities and received pain management injections received these injections through entities owned or affiliated with Gunabalan, namely Orthopedic Surgeons P.C. and Maple Millennium Medical Center, LLC.

142.   Thus, Gunabalan profited not only from the patients' physical and occupational therapy at the Treatment Facilities and medical examinations performed at the Prescribing Clinics, but also from spinal injections performed at Orthopedic Surgeons and Maple Millennium.

### H.     Violations Of Michigan Self-Referral Law

143.   The   Michigan   Public   Health   Code   prohibits   self-referrals. Specifically, the Michigan Public Health Code incorporates and applies the Federal Stark Law and regulations prohibiting referrals by a physician for designated health services to any entity in which the physician has a financial relationship. *See* MCL § 333.16221(e)(iv)(B); *see also* MCL 333.16221(e)(iii) (prohibiting "[p]romotion for personal gain of an unnecessary drug, device, treatment, procedure, or service"); MCL 333.16221(h) (prohibiting "[a] violation, or aiding or abetting in a violation, of this article or of a rule promulgated under this article"). In Michigan, these prohibitions apply regardless of the source of payment for the health services.  *See* MCL § 333.16221(e)(iv)(B).

144.   Designated health services include: (a) "[p]hysical therapy services"; (b) "[o]ccupational therapy services"; and (c) "radiology services, including magnetic resonance imaging."  42 USC § 1395nn(h)(6).

145.   A "financial relationship" includes any ownership, investment, or compensation arrangement between the physician and the entity providing the designated health service.  42 USC § 1395nn(a)(2).  An ownership or investment interest may be through equity, debt, or other means, and includes an interest in an entity that holds an ownership or investment interest in any entity providing the designated health service.  *Id.*  A compensation arrangement means any

70

arrangement involving any remuneration between a physician and an entity providing the designated health service.  42 USC § 1395nn(h)(1).

146.   A physician cannot circumvent the Stark law or the prohibitions in Michigan by having a physician under his or her control make a referral.  Under the Stark law, "Referring physician means a physician who makes a referral as defined in this section or who directs another person or entity to make a referral or who controls referrals made by another person or entity.  A referring physician and the professional corporation of which he or she is a sole owner are the same for purposes of this subpart."  42 C.F.R. § 411.351.

147.   Thus, under Michigan and federal law, physicians may not refer patients for physical therapy, occupational therapy, or MRIs – or  direct others to make physical therapy, occupational therapy, or MRI referrals – to facilities in which the physician has a financial relationship.  The policy rationale behind these prohibitions on self-referrals is that medical treatment should be guided solely by the patient's legitimate medical needs and physicians should not recommend services based on personal financial gain, rather than medical necessity.  By prohibiting physicians from referring to facilities in which the physician has a direct or indirect financial interest, the Michigan Public Health Code and the Federal Stark law seek to reduce medically unnecessary services based on financial

motives as opposed to patient needs and eliminate financial factors that may interfere with a provider's independent medical judgment.

148.   Physicians at the Prescribing Clinics violated Michigan's prohibition on self-referrals when they referred patients (a) for physical and occupational therapy to Pointe and New Era; and (b) for MRIs to Bio-Magnetic.  Accordingly, none of these services were "lawfully render[ed]" under the No-Fault Act.  *See* M.C.L. § 500.3157 (only a "physician, hospital, clinic or other person or institution lawfully rendering treatment to an injured person" is entitled to payment).  The bills and supporting documentation submitted by the Prescribing Clinics, Treatment Facilities, and Bio-Magnetic, were fraudulent for this reason as well.

## I.    State Farm's Justifiable Reliance

149.   Defendants are obligated legally and ethically to act honestly and with integrity.  Yet, Defendants submitted, or caused to be submitted, bills, medical records and supporting documentation that are fraudulent in that they represent that the services were actually and lawfully rendered and were reimbursable, and were medically necessary when, in fact, they either were not performed or were performed pursuant to a Predetermined Protocol that was designed and carried out to enrich Defendants by maximizing their collection of the patients' No-Fault Benefits, and in violation of Michigan's prohibition on physician self-referrals.

150.  State Farm is under statutory and contractual duties to pay No-Fault Benefits promptly for medically necessary services that are lawfully rendered.  The bills and supporting documents that Defendants submitted, and caused to be submitted, to State Farm in support of the fraudulent charges at issue, combined with the material misrepresentations described above, were designed to and did cause State Farm to justifiably rely on them.

151.  As a result, State Farm has incurred damages of more than $775,000 in benefits paid based upon the fraudulent charges.

152.  Based upon Defendants' material misrepresentations and other affirmative acts to conceal their fraud from State Farm, State Farm did not discover and could not have reasonably discovered that its damages were attributable to fraud until shortly before it filed this Complaint.  Indeed, State Farm did not discover and could not have reasonably discovered Defendants' fraud scheme until it reviewed together hundreds of bills and supporting documentation submitted by Defendants to State Farm that, when considered together, revealed the Predetermined Protocol.

## III.   JURISDICTION AND VENUE

153.  Pursuant to 28 U.S.C. § 1332(a)(1), this Court has jurisdiction over all claims because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

154.   Pursuant to 28  U.S.C. § 1331, this Court has jurisdiction over the claims brought under 18 U.S.C. § 1961 *et seq.* ("RICO") because they arise under the laws of the United States.

155.   This Court has jurisdiction over the state law claims because they are so related to the RICO claims as to form part of the same case and controversy.

156.   Pursuant to 28 U.S.C. § 1391(b), venue is proper in this district because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## IV.   THE PARTIES

### A.   Plaintiff

157.   State Farm Mutual Automobile Insurance Company is a corporation incorporated under the laws of the State of Illinois, with its principal place of business in Bloomington, Illinois.  It is licensed and engaged in the business of insurance in Michigan.

### B.   Defendants

#### 1.   Treatment Facility Defendants

158.   Defendant Pointe Physical Therapy, LLC is a Michigan Limited Liability Company with its principal place of business at 17200 East Ten Mile Road, Eastpointe, Michigan.  From approximately 2009 through at least November 2013, Pointe has knowingly submitted, and caused to be submitted, bills, medical

records, and supporting documentation as described, in part, in the chart attached hereto as Ex. 1 that are fraudulent in that they represent that the services were actually and lawfully rendered and were reimbursable, and were medically necessary when, in fact, they either were not performed or were performed pursuant to a Predetermined Protocol that was designed and carried out to enrich Defendants by maximizing their collection of the patients' No-Fault Benefits, and in violation of Michigan's prohibition on physician self-referrals

159.   Defendant New Era Physical Therapy, P.C. ("New Era I") is a Michigan corporation with its principal place of business at G4007 West Court, Flint, Michigan.  From approximately December 2007 through October 2009, New Era I knowingly submitted, and caused to be submitted, bills, medical records, and supporting documentation as described, in part, in the chart attached hereto as Ex. 2 that are fraudulent in that they represent that the services were actually and lawfully rendered and were reimbursable, and were medically necessary when, in fact, they either were not performed or were performed pursuant to a Predetermined Protocol that was designed and carried out to enrich Defendants by maximizing their collection of the patients' No-Fault Benefits, and in violation of Michigan's prohibition on physician self-referrals.  New Era I and New Era II are alter egos of one another because there is a unity of interest and ownership and/or they are organized and controlled so as to make New Era II a mere instrumentality

or agent of New Era I, such that the separate existence of New Era I and New Era II cease to exist.  Moreover, the fraudulent conduct of New Era I and New Era II is such that adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice.

160.   Defendant New Era PT Services Inc. ("New Era II") is a Michigan corporation with its principal place of business at G4007 West Court G-2, Flint, Michigan.  From approximately 2010 through at least October 2013, New Era II has knowingly submitted, and caused to be submitted, bills, medical records, and supporting documentation as described, in part, in the chart attached hereto as Ex. 2 that are fraudulent in that they represent that the services were actually and lawfully rendered and were reimbursable, and were medically necessary when, in fact, they either were not performed or were performed pursuant to a Predetermined Protocol that was designed and carried out to enrich Defendants by maximizing their collection of the patients' No-Fault Benefits, and in violation of Michigan's prohibition on physician self-referrals.  New Era I and New Era II are alter egos of one another because there is a unity of interest and ownership and/or they are organized and controlled so as to make New Era II a mere instrumentality or agent of New Era I, such that the separate existence of New Era I and New Era II cease to exist.  Moreover, the fraudulent conduct of New Era I and New Era II is

such that adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice.

### 2.    Prescribing Clinics

161.   Michigan Visiting Physicians, PC d/b/a Choice House Call ("Choice") is a professional service corporation incorporated under the laws of the State of Michigan, with its principal place of business at 17200 East Ten Mile Road, Eastpointe, Michigan.  As set forth, in part, in the charts attached hereto as Exs. 1 and 2, many of the referrals for physical and occupational therapy performed through Pointe for which bills were submitted to State Farm came through Choice and physicians employed by and associated with Choice, including defendants Gunabalan, Quiroga and Ruden, and others, such as Dr. M. Shakeel Awaisi and Dr. Zakiya Autoine.

162.   Mundy Pain Clinic P.C. is a professional service corporation with its principal place of business at 6240 Rashelle Drive, Suite 103, Flint, Michigan.  As set forth, in part, in the chart attached hereto as Ex. 2, many of the referrals for physical and occupational therapy performed through New Era for which bills were submitted to State Farm came through Mundy and physicians employed by and associated with Mundy, including defendants Hoban, Quiroga and Ruden, and others, such as Dr. M. Shakeel Awaisi.

163.   Medical Evaluations P.C. is a professional service corporation with its principal place of business at 17117 West Nine Mile Road, Suite 1325, Southfield, Michigan and 21411 Civic Center, Suite 102, Southfield, Michigan.   Medical Evaluations employed least six physicians, including defendants Beale and Ruden, as well as Dr. Irwin Lutwin, Dr. John Fow, Dr. Joel Milliner and Dr. Nazih Iskander, who similarly examined, diagnosed and prescribed physical and/or occupational therapy for patients who treated at Pointe.  As set forth, in part, in the chart attached hereto as Ex. 1, many of the referrals for physical and occupational therapy performed at Pointe for which bills were submitted to State Farm came through Medical Evaluations.

### 3.    Management Group Defendants

164.   Defendant Ram Gunabalan resides in and is a citizen of Michigan. Gunabalan has been a licensed medical doctor in Michigan since 1973.   At all relevant times, he owned and/or controlled the Treatment Facilities and Prescribing Clinics, and thus, directed their activities and the activities of those who were employed by and associated with them.   In addition, Gunabalan owns Bio-Magnetic, the MRI Facility where many of the patients who purported to treat at the Prescribing Clinics and Treatment Facilities were sent for MRIs.  Gunabalan also owns Michigan Biotech, another MRI facility which submits bills from Bio-Magnetic's address and to which Gunabalan and the Prescribing Physicians and

Clinics also sent patients.  Additionally, Gunabalan also has a financial interest in Orthopedic Surgeons P.C. and Maple Millennium Medical Center, LLC, which purported to provide spinal injections to patients who treated at the Prescribing Clinics and Treatment Facilities.  *See* Ex. 26.

165.   Defendant Sherif El-Sayed resides in and is a citizen of Michigan.  At all relevant times, he owned and/or controlled the Treatment Facilities and Prescribing Clinics, and thus, directed their activities and the activities of those who were employed by and associated with them.

166.   Defendant Amale Bazzi a/k/a Amanda Bazzi resides in and is a citizen of Michigan.  At all relevant times, she owned and/or controlled the Treatment Facilities and Prescribing Clinics, and thus, directed their activities and the activities of those who were employed by and associated with them.

### 4.   Prescribing Physician Defendants

167. Defendant Martin Quiroga, D.O. resides in and is a citizen of Michigan.  Quiroga has been a licensed medical doctor in Michigan since August 2008.  From approximately spring 2010 to summer 2011, Quiroga worked at Mundy.  From approximately March 2010 to March 2011, Quiroga worked at Choice.  Beginning as least as of March 2010, Quiroga began examining, diagnosing and prescribing medically unnecessary physical and occupational therapy for patients who treated at the Treatment Facilities.  Quiroga prescribed

physical and/or occupational therapy for many of the patients who treated at the Treatment Facilities for whom bills were submitted to State Farm. *See* Exs. 1 and 2.

168. Defendant Andrew Ruden M.D. resides in and is a citizen of Michigan. Ruden has been a licensed medical doctor in Michigan since 1979. From approximately May 2009 to March 2011, Ruden worked at Mundy and Choice. In addition, Ruden worked at Medical Evaluations, P.C. for two months, in August and September 2009. Beginning as early as November 2010, Ruden began examining, diagnosing and prescribing medically unnecessary physical and occupational therapy for patients who treated at New Era. Ruden prescribed physical and/or occupational therapy for many of the patients who treated at New Era for whom bills were submitted to S20tate Farm.

169. Defendant James Beale Jr., M.D. resides in and is a citizen of Michigan. Beale has been a licensed medical doctor in Michigan since 1975. Beale is the paper owner of and performs examinations at Medical Evaluations. Beginning as early as April 2009, Beale began examining, diagnosing and prescribing medically unnecessary physical and occupational therapy for patients who treated at Pointe. Beale prescribed physical and/or occupational therapy for many of the patients who treated at Pointe for whom bills were submitted to State Farm.

170. Defendant Sean J. Hoban, M.D., resides in and is a citizen of Michigan. Hoban has been a licensed medical doctor in Michigan since 1967. From late 2007 through early 2011, Hoban worked at IMA. In approximately March 2011, Hoban started working at Mundy. Beginning as early as January 2008, Hoban began examining, diagnosing and prescribing medically unnecessary physical and occupational therapy for patients who treated at New Era. Hoban prescribed physical and/or occupational therapy for many of the patients who treated at New Era for whom bills were submitted to State Farm.

### 5.    The MRI Facility

171. Bio-Magnetic Resonance, Inc. ("Bio-Magnetic") is a Michigan corporation with its principal place of business at 30781 Stevenson Highway, Madison Heights, Michigan. From approximately late 2009 until at least June 2011, Bio-Magnetic submitted, and caused to be submitted, bills and supporting documentation, described in the chart attached to the complaint as Ex. 27 for MRI tests. These submissions were fraudulent in that they represented that the services were actually rendered and were medically necessary when, in fact, the services were not necessary or were performed pursuant to a protocol that was designed and carried out to enrich Defendants by maximizing collection of the patients' No-Fault Benefits, and not to benefit the patients. Bio-Magnetic was owned and/or controlled by Gunabalan who is identified as Bio-Magnetic's President and

Registered Agent in corporate filings with the State of Michigan, and as its President on Bio-Magnetic's webpage. *See* Ex. 25.

## V.    CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
### COMMON LAW FRAUD
### (Against All Defendants)

172.   State Farm incorporates, adopts and re-alleges as though fully set forth herein, each and every allegation in Paragraphs 1 through 171 above.

173.   Defendants intentionally and knowingly made false and fraudulent statements of material fact to State Farm by submitting, and causing to be submitted, hundreds of fraudulent bills and related documentation that contained false representations of material fact.

174.   The false representations of material fact include that (a) the Prescribing Physicians and physicians employed by and associated with the Prescribing Clinics legitimately examined and prescribed physical therapy and occupational therapy that was medically necessary and tailored to the unique needs of each patient, when in fact they did not do so; (b) the Prescribing Physicians and physicians employed by and associated with the Prescribing Clinics legitimately determined that patients were disabled; (c) the Treatment Facilities provided treatments that were medically necessary and tailored to the unique needs of each patient, when in fact they were not, if they were provided at all; (d) both physical

therapy and occupational therapy services were necessary and performed when in fact they were not; (e) MRI tests were ordered that were medically necessary and tailored to the unique needs of each patient, when in fact they were not; and (f) the services were lawfully rendered and were remibursable, when in fact they violated Michigan's prohibition on self-referrals.  The fraudulent bills and dates of first mailings are described in Exs. 1, 2 and 27.  Representative samples of these bills and supporting documentation are attached as Exs. 13, 28 and 29.

175.  Defendants knew that the above-described misrepresentations made to State Farm relating to the purported examination, evaluation, diagnoses, and treatment of patients were false and fraudulent when they were made.

176.  Defendants made the above-described misrepresentations and engaged in such conduct to induce State Farm into relying on the misrepresentations.

177.  As a result of its justifiable reliance on these misrepresentations, State Farm has incurred damages of at least $775,000.

178.  The willful, reckless, and/or wanton conduct of Defendants entitles State Farm to punitive damages.

WHEREFORE, State Farm demands judgment against Pointe, New Era I, New Era II, Choice, Mundy, Medical Evaluations, Gunabalan, Quiroga, Ruden, Beale, Hoban, El-Sayed, Bazzi, and Bio-Magnetic for compensatory damages,

punitive damages, costs, and other such relief as this Court deems equitable, just and proper.

## SECOND CLAIM FOR RELIEF
## VIOLATION OF 18 U.S.C. § 1962(c)
### (Against All Defendants)

179.   State Farm incorporates, adopts and re-alleges as though fully set forth herein, each and every allegation in Paragraphs 1 through 171 above.

180.   Pointe, New Era I, New Era II, Choice, Mundy, Medical Evaluations, Gunabalan, Quiroga, Ruden, Beale, Hoban, El-Sayed, Bazzi, and Bio-Magnetic formed an association-in-fact "enterprise" (the "Treatment Enterprise") as that term is defined in 18 U.S.C. § 1961(4), that engages in, and the activities of which affect, interstate commerce.

181.   The members of the Treatment Enterprise are and have been joined in a common purpose, have relationships with and among each other, and have associated through time sufficient to permit those associated to pursue the enterprise's purpose.   Pointe, New Era I, New Era II, Choice, Mundy, Medical Evaluations, Gunabalan, Quiroga, Ruden, Beale, Hoban, El-Sayed, Bazzi, and Bio-Magnetic forged symbiotic relationships and needed and depended upon the participation of the others to accomplish their common purpose of defrauding State Farm through fraudulent personal injury claims.   Specifically, the Treatment Facilities, Pointe, New Era I and New Era II, profited by billing State Farm for the

physical therapy and occupational therapy but depend on prescriptions issued by the Prescribing Clinics and the Prescribing Physicians.  The Prescribing Clinics and Prescribing Physicians profit by fraudulently billing State Farm directly for each instance in which they purportedly examine patients who they treat and benefit when the Treatment Facilities refer the patients back to them for continuing treatment and re-diagnosis.  The Management Group participates in each of these activities, own and/or control the Treatment Facilities and the Prescribing Clinics, profit from the treatment provided at the Treatment Facilities and the Prescribing Clinics, and funnel patients into treatment at the Treatment Facilities.  Additionally, Gunabalan himself purports to treat patients, prescribe therapy and other medical services.  The MRI Facility profited by billing State Farm for medically unnecessary MRI tests performed on patients of the Treatment Facilities and depend on prescriptions issued by the Prescribing Clinics and the Prescribing Physicians.  The participation and role of each of the Defendants was necessary to the success of the scheme.  Neither Pointe, New Era I, New Era II, Choice, Mundy, Medical Evaluations, Gunabalan, Quiroga, Ruden, Beale, Hoban, El-Sayed, Bazzi, nor Bio-Magnetic was capable of carrying out the scheme without the participation of the others.

182.   Pointe, New Era I, New Era II, Choice, Mundy, Medical Evaluations, Gunabalan, Quiroga, Ruden, Beale, Hoban, El-Sayed, Bazzi, and Bio-Magnetic are or have been employed by and associated with the Treatment Enterprise.

183.   Pointe, New Era I, New Era II, Choice, Mundy, Medical Evaluations, Gunabalan, Quiroga, Ruden, Beale, Hoban, El-Sayed, Bazzi, and Bio-Magnetic have knowingly conducted and/or participated, directly or indirectly, in the conduct of the Treatment Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of United States mails to submit to State Farm hundreds of fraudulent claims, consisting of bills and supporting documentation that were fraudulent in that they were for examinations, diagnoses, MRIs, and treatments, which were not performed, were performed pursuant to a Predetermined Protocol that was designed and carried out to enrich Defendants by maximizing collection of the patients' No-Fault Benefits, and not to benefit the patients.  The false representations of material fact include that (a) the Prescribing Physicians and physicians employed by and associated with the Prescribing Clinics legitimately examined and prescribed physical therapy and occupational therapy that was medically necessary and tailored to the unique needs of each patient, when in fact they did not do so; (b) the Prescribing Physicians and physicians employed by and associated with the Prescribing Clinics legitimately determined

that patients were disabled; (c) the Treatment Facilities provided treatments that were medically necessary and tailored to the unique needs of each patient, when in fact they were not, if they were provided at all; (d) both physical therapy and occupational therapy services were necessary and performed when in fact they were not; (e) MRI tests were ordered that were medically necessary and tailored to the unique needs of each patient, when in fact they were not; and (f) the services were lawfully rendered and were reimbursable, when in fact they violated Michigan's prohibition on self-referrals.

184.   The fraudulent bills and corresponding mailings which comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in Exs. 1, 2 and 27.   Representative samples of these bills and supporting documentation are attached as Exs. 13, 28 and 29.

185.   State Farm has been injured in its business and property by reason of the above-described conduct in that it has paid more than $775,000 based upon the fraudulent charges.

WHEREFORE, State Farm demands judgment against Pointe, New Era I, New Era II, Choice, Mundy, Medical Evaluations, Gunabalan, Quiroga, Ruden, Beale, Hoban, El-Sayed, Bazzi, and Bio-Magnetic for compensatory damages, together with treble damages, costs and reasonable attorneys' fees pursuant to 18

U.S.C. § 1964(d), plus interest, and any other relief the Court deems just and proper.

## THIRD CLAIM FOR RELIEF
## VIOLATION OF 18 U.S.C. § 1962(d)
### (Against All Defendants)

186.   State Farm incorporates, adopts and re-alleges as though fully set forth herein, each and every allegation in Paragraphs 1 through 171 and 179 through 185 above.

187.   Pointe, New Era I, New Era II, Choice, Mundy, Medical Evaluations, Gunabalan, Quiroga, Ruden, Beale, Hoban, El-Sayed, Bazzi, and Bio-Magnetic have knowingly agreed and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Treatment Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit to State Farm claims, consisting of bills and supporting documentation that were fraudulent in that they were for examinations, diagnoses, MRIs, and treatments, which were not performed or were performed pursuant to a Predetermined Protocol that was designed and carried out to enrich Defendants by maximizing collection of the patients' No-Fault Benefits, and not to benefit the patients.

188.   The fraudulent bills and corresponding mailings which comprise the pattern of racketeering activity identified through the date of this Complaint are

described, in part, in Exs. 1, 2 and 27, attached hereto.  Representative samples of these bills and supporting documentation are attached as Exs. 13, 28, and 29.

189.   Pointe, New Era I, New Era II, Choice, Mundy, Medical Evaluations, Gunabalan, Quiroga, Ruden, Beale, Hoban, El-Sayed, Bazzi, and Bio-Magnetic agreed to and acted in furtherance of the common and overall objective of the conspiracy by facilitating the submission to State Farm of bills and related documentation for examinations, diagnoses, and treatments, which were not performed, were performed pursuant to a Predetermined Protocol, were medically unnecessary, and/or were unlawfully rendered in violation of Michigan's prohibition on physician self-referrals.

190.   State Farm has been injured in its business and property by reason of the above-described conduct in that it has paid more than $775,000 based upon the fraudulent charges.

WHEREFORE, State Farm demands judgment against Pointe, New Era I, New Era II, Choice, Mundy, Medical Evaluations, Gunabalan, Quiroga, Ruden, Beale, Hoban, El-Sayed, Bazzi, and Bio-Magnetic for compensatory damages, together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(d), plus interest, and any other relief the Court deems just and proper.

## FOURTH CLAIM FOR RELIEF
## UNJUST ENRICHMENT
### (Against the All Defendants)

191.   State Farm incorporates, adopts and re-alleges as though fully set forth herein, each and every allegation in Paragraphs 1 through 171 above.

192.   State Farm conferred a benefit upon Pointe, New Era I, New Era II, Choice, Mundy, Medical Evaluations, Gunabalan, Quiroga, Ruden, Beale, Hoban, El-Sayed, Bazzi, and Bio-Magnetic by paying their claims and these Defendants voluntarily accepted and retained the benefit of those payments.

193.   Because Pointe, New Era I, New Era II, Choice, Mundy, Medical Evaluations, Gunabalan, Quiroga, Ruden, Beale, Hoban, El-Sayed, Bazzi, and Bio-Magnetic knowingly submitted, and caused to be submitted, fraudulent bills and related documentation for examinations, diagnoses, and treatments, the circumstances are such that it would be inequitable to allow them to retain the benefit of the monies paid.

194.   As a direct and proximate result of the above-described conduct, State Farm has been damaged and Pointe, New Era I, New Era II, Choice, Mundy, Medical Evaluations, Gunabalan, Quiroga, Ruden, Beale, Hoban, El-Sayed, Bazzi, and Bio-Magnetic have been unjustly enriched by more than $775,000.

WHEREFORE, State Farm demands judgment against Pointe, New Era I, New Era II, Choice, Mundy, Medical Evaluations, Gunabalan, Quiroga, Ruden,

Beale, Hoban, El-Sayed, Bazzi, and Bio-Magnetic for compensatory damages plus interest and costs and for such other relief as the Court deems equitable, just and proper.

## FIFTH CLAIM FOR RELIEF
## DECLARATORY JUDGMENT
### (Against Pointe Physical Therapy)

195.   State Farm incorporates, adopts and re-alleges as though fully set forth herein, each and every allegation in Paragraphs 1 through 171 above.

196.   This is an action for declaratory relief pursuant to 28 U.S.C. § 2201.

197.   There is an actual case and controversy between State Farm, on the one hand, and Pointe Physical Therapy, on the other hand as to all charges for examinations, diagnoses, and treatments that have not been paid.   State Farm contends that Pointe Physical Therapy is not entitled to reimbursement for any of these charges.

198.   Because Pointe Physical Therapy and its owners have made false and fraudulent statements and otherwise engaged in the above-described fraudulent conduct with the intent to conceal and misrepresent material facts and circumstances regarding each claim submitted to State Farm, Pointe Physical Therapy is not entitled to reimbursement for any of the claims at issue.

WHEREFORE, State Farm respectfully requests a judgment declaring that Pointe Physical Therapy is not entitled to reimbursement for any of the unpaid

charges for the examinations, diagnoses, and treatments, and for supplementary relief, attorneys' fees, interest and costs as this Court deems equitable, just and proper.

**SIXTH CLAIM FOR RELIEF**
**DECLARATORY JUDGMENT**
**(Against New Era Physical Therapy, P.C.)**

199. State Farm incorporates, adopts and re-alleges as though fully set forth herein, each and every allegation in Paragraphs 1 through 171 above.

200. This is an action for declaratory relief pursuant to 28 U.S.C. § 2201.

201. There is an actual case and controversy between State Farm, on the one hand, and New Era Physical Therapy, P.C. ("New Era I"), on the other hand as to all charges for examinations, diagnoses, and treatments that have not been paid. State Farm contends that New Era I is not entitled to reimbursement for any of these charges.

202. Because New Era I and its owners have made false and fraudulent statements and otherwise engaged in the above-described fraudulent conduct with the intent to conceal and misrepresent material facts and circumstances regarding each claim submitted to State Farm, New Era I is not entitled to reimbursement for any of the claims at issue.

WHEREFORE, State Farm respectfully requests a judgment declaring that New Era I is not entitled to reimbursement for any of the unpaid charges for the

examinations, diagnoses, and treatments, and for supplementary relief, attorneys' fees, interest and costs as this Court deems equitable, just and proper.

## SEVENTH CLAIM FOR RELIEF
## DECLARATORY JUDGMENT
### (Against New Era PT Services, Inc.)

203.   State Farm incorporates, adopts and re-alleges as though fully set forth herein, each and every allegation in Paragraphs 1 through 171 above.

204.   This is an action for declaratory relief pursuant to 28 U.S.C. § 2201.

205.   There is an actual case and controversy between State Farm, on the one hand, and New Era PT Services, Inc. ("New Era II"), on the other hand as to all charges for examinations, diagnoses, and treatments that have not been paid. State Farm contends that New Era II is not entitled to reimbursement for any of these charges.

206.   Because New Era II and its owners have made false and fraudulent statements and otherwise engaged in the above-described fraudulent conduct with the intent to conceal and misrepresent material facts and circumstances regarding each claim submitted to State Farm, New Era II is not entitled to reimbursement for any of the claims at issue.

WHEREFORE, State Farm respectfully requests a judgment declaring that New Era II is not entitled to reimbursement for any of the unpaid charges for the

examinations, diagnoses, and treatments, and for supplementary relief, attorneys' fees, interest and costs as this Court deems equitable, just and proper.

## EIGHTH CLAIM FOR RELIEF
## DECLARATORY JUDGMENT
### (Against Bio-Magnetic Resonance, Inc.)

207.   State Farm incorporates, adopts and re-alleges as though fully set forth herein, each and every allegation in Paragraphs 1 through 171 above.

208.   This is an action for declaratory relief pursuant to 28 U.S.C. § 2201.

209.   There is an actual case and controversy between State Farm, on the one hand, and Bio-Magnetic Resonance, Inc. ("Bio-Magnetic"), on the other hand as to all charges for examinations, diagnoses, and treatments that have not been paid.  State Farm contends that Bio-Magnetic is not entitled to reimbursement for any of these charges.

210.   Because Bio-Magnetic and its owners have made false and fraudulent statements and otherwise engaged in the above-described fraudulent conduct with the intent to conceal and misrepresent material facts and circumstances regarding each claim submitted to State Farm, Bio-Magnetic is not entitled to reimbursement for any of the claims at issue.

WHEREFORE, State Farm respectfully requests a judgment declaring that Bio-Magnetic is not entitled to reimbursement for any of the unpaid charges for the

examinations, diagnoses, and treatments, and for supplementary relief, attorneys' fees, interest and costs as this Court deems equitable, just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), State Farm demands a trial by jury.

Dated: April 29, 2014

By: s/Thomas W. Cranmer

Thomas W. Cranmer  (P25252)
Matthew P. Allen  (P57914)
Miller, Canfield P.L.C.
840 W. Long Lake Road, Suite 200
Troy, Michigan  48098
(248)-267-3381
cranmer@millercanfield.com
allen@millercanfield.com

Ross O. Silverman  (IL 6226560)
Jonathan L. Marks  (IL 6201572)
Kathy P. Josephson  (IL 6278242)
Kathleen A. Kelley  (IL 6288296) (*E.D. Mich. admission pending*)
Katten Muchin Rosenman LLP
525 West Monroe Street
Chicago, IL  60661-3693
(312) 902-5200
ross.silverman@kattenlaw.com
jonathan.marks@kattenlaw.com
kathy.josephson@kattenlaw.com
kathleen.kelley@kattenlaw.com

*Attorneys for Plaintiff State Farm Mutual Automobile Insurance Company*